# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### November 1, 2011 Session

## STATE OF TENNESSEE v. NIGEL KAVIC WATKINS

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Smith County**
**No. 04-194      John Wootten, Judge**

**No. M2009-00348-SC-R11-CD - Filed March 9, 2012**

We granted the State permission to appeal to determine whether the defendant's dual convictions for reckless homicide and aggravated child abuse violate either the federal or state constitutional prohibition against double jeopardy. Following briefing, oral argument, and a careful study of Tennessee law governing the issue presented, we ordered the parties in this appeal, and two other pending appeals involving related issues, to submit additional briefs addressing certain specific questions concerning the analyses that Tennessee courts apply in single prosecution cases when determining whether separate convictions under different statutes constitute the same offense for purposes of the double jeopardy protection against multiple punishments. We also scheduled consolidated reargument of these three appeals and invited certain prosecutorial and defense organizations to submit amicus curiae briefs. Having thoroughly reviewed relevant federal and state precedent and carefully considered the briefs provided by the parties and by the amici curiae, we have concluded that the four-factor test set forth in State v. Denton, 938 S.W.2d 373 (Tenn. 1996) should be abandoned. Furthermore, we have not found, nor have we been provided with, any textual reason or historical basis for interpreting the Double Jeopardy Clause of the Tennessee Constitution differently from the Double Jeopardy Clause of the United States Constitution. Accordingly, we adopt the same elements test enunciated in Blockburger v. United States, 284 U.S. 299, 304 (1932) as the test for determining whether multiple convictions under different statutes constitute the same offense for purposes of the Double Jeopardy Clause of the Tennessee Constitution. Applying this test, we conclude that reckless homicide and aggravated child abuse are not the same offense because their elements differ. Thus, the defendant's dual convictions do not violate either the federal or the state constitutional double jeopardy prohibition. Accordingly, we reverse that portion of the Court of Criminal Appeals' judgment merging the reckless homicide conviction into the aggravated child abuse conviction, and we reinstate the reckless homicide conviction. However, we affirm that portion of the Court of Criminal Appeals' judgment remanding this matter to the trial court for resentencing.

**Tenn. R. App. 11 Appeal by Permission; Judgment of the
Court of Criminal Appeals Reversed in Part, Affirmed in Part;
Remanded to the Trial Court for Resentencing**

CORNELIA A. CLARK, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Robert E. Cooper, Jr., Attorney General & Reporter; Leslie E. Price and Angele Gregory, Assistant Attorneys General; Tom P. Thompson, Jr., District Attorney; David Earl Durham, Jason Lawson, and Brian W. Fuller, Assistant District Attorneys General, for the appellant, State of Tennessee.

Shawn P. Sirgo, Nashville, Tennessee (on appeal); Comer L. Donnell, District Public Defender; Tillman W. Payne III, William Cather, and Tom Bilbrey, Assistant Public Defenders (at trial), for the appellee, Nigel Kavic Watkins.

Stephen Ross Johnson; Wade V. Davies, and Ann C. Short, Knoxville, Tennessee; Aimee D. Solway, Nashville, Tennessee, for the Amicus Curiae, The Tennessee Association of Criminal Defense Lawyers.

Kathy Morante, Nashville, Tennessee; William Crabtree, Knoxville, Tennessee; and Garland Erguden, Memphis, Tennessee, for the Amicus Curiae, Tennessee District Attorneys General Conference.

## OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

Nigel Watkins ("Defendant") killed the thirteen-month-old victim, Elijah J. Cannon, by deliberately striking the child's head "hard" against a wall. Defendant was tried pursuant to an indictment charging one count of first-degree felony murder during the perpetration of aggravated child abuse and one count of aggravated child abuse by knowingly, and other than by accidental means, treating the victim in such a manner as to inflict injury that resulted in serious bodily injury.

The proof introduced at trial established that, at the time of his death, Elijah lived in Carthage, Tennessee, with his mother, his two older brothers, ages three and four, and Defendant. On August 30, 2004, the victim arrived by ambulance at Carthage General Hospital, where Dr. Richard Rutherford, the emergency room physician on call, diagnosed "[a]pparent closed head trauma, probably non-accidental." According to Dr. Rutherford, the victim "was not breathing on his own," "was unresponsive to any external stimuli," had "very

pale, ashen white" skin, "had bruises about the head and neck," had an "abnormal" gaze, and "obviously appeared to be seriously sick, seriously ill." Dr. Rutherford opined that the bruising on the victim's head and neck was unrelated to the closed-head trauma and did not appear to have been inflicted within the previous few hours.

Emergency room medical personnel immediately began treatment for the victim, and once he had been stabilized to some degree, Dr. Rutherford arranged for his transfer to Vanderbilt Children's Hospital ("Vanderbilt"), explaining that the victim "needed specialty care if he was going to have any chance of survival." The victim was transported to Vanderbilt by air ambulance in critical condition.

Shortly after learning of the victim's arrival at Carthage General Hospital, Steve Hopper, Chief of the Carthage Police Department, spoke with Defendant at Defendant's Carthage residence on August 30, 2004. Chief Hopper made a video recording of this conversation using his patrol car video camera. On the video recording, admitted into evidence at Defendant's trial and included in the record on appeal, Defendant said repeatedly that he did not know what was wrong with the victim. Defendant explained that the victim had been "screaming," but when Defendant picked him up, the child took a deep breath but did not exhale, and then went limp and lifeless. Thinking the victim may have had the wind knocked out of him somehow, Defendant said he began slapping the victim's back to "knock the wind back into him." Defendant also said that he thought the victim might have been having a seizure because, in addition to going limp, the victim's eyes had rolled back. Defendant said the victim's breathing slowed until six or seven seconds passed between each of the victim's breaths. Defendant then knew something was wrong, so he called for the ambulance. Defendant said the victim had been congested and that he and the victim's mother had given the victim medication for the congestion. Defendant speculated that the medication might have caused the problem. Defendant was not aware of the victim previously having seizures or any other medical problems.

At the conclusion of the videotape, Defendant accompanied Chief Hopper to the Carthage Police Department and spoke further about what happened to the victim. At trial, Chief Hopper read from the notes he made of this conversation:

> [Defendant] states that he had been living in the Projects with Ashley Cannon and these babies for about one year, that Elijiah had been sick, and approximately 20:00 hours, which would be 8:00 o'clock p.m. regular time, August 29th '04, that Ashley put Elijiah to bed and probably gave him some kind of over the counter medication. That at approximately 22:30 hours, which would be 10:30 p.m., August 29th '04, Ashley comes home and we both go in the children's bedroom to check on Elijiah. Then approximately 15:00 hours, which would be 3:00 o'clock p.m., August the 30th of '04, Elijiah

wakes from a nap. Ashley takes Elijiah downstairs and then comes back upstairs to go to the bathroom. Then Elijiah was crying very loudly, that he, [Defendant], goes downstairs and picks Elijiah up, that when he, [Defendant], picks Elijiah up, Elijiah takes a deep breath and goes limp. [Defendant] states that he patted Elijiah on the back, attempted CPR and shook him. He acted out a vigorous shake using both hands. Then Elijiah was taking a breath every six to seven seconds and his eyes were rolled back up into his head. He took Elijiah upstairs to Ashley and the EMS was activated at that point.

After talking with Defendant at the Police Department, Chief Hopper contacted Agent Russ Winkler of the Tennessee Bureau of Investigation ("TBI"). Agent Winkler and Chief Hopper drove to Vanderbilt, where the victim had been transferred. Defendant was already at Vanderbilt when Agent Winkler and Chief Hopper arrived, as were Patrick Warren of the Department of Children's Services and TBI Agent Jason Locke. After receiving information from the doctors at Vanderbilt indicating the victim's injuries were not consistent with the statement Defendant gave at the Carthage Police Department, Agent Winkler decided to conduct a second interview of Defendant. Because Agent Winkler knew of no appropriate place at Vanderbilt to conduct the interview, Agent Locke asked Defendant to accompany law enforcement personnel to TBI headquarters, which was nearby. Defendant agreed. Agent Locke, Chief Hopper, and Defendant drove to TBI headquarters in one vehicle; Agent Winkler and Mr. Warren drove in a separate vehicle. Defendant was informed that he was neither under arrest nor in custody and that he could leave at any time.

When the group arrived at TBI headquarters, Agent Winkler interviewed Defendant. After Defendant's verbal statement was reduced to written form, Defendant reviewed and signed the statement. Defendant's written statement, admitted into evidence at trial, provides as follows:

I understand that I am not under arrest. I have come to the TBI Office in Nashville voluntarily to be interviewed about what happened to Elijiah. No threats have been made to me, and no promises have been made to me for giving this statement. I live with Ashley Cannon. We have dated for about a year. We have lived together for about six months. Ashley has three kids that live with us. Her kids are Oliver, Wylie and Eli. Oliver is 4. Wylie is 3. Eli is 1. The kids' daddy is John Bennett. Earlier today, around 3:00 this afternoon I was just getting up from a nap. Ashley had been taking a nap with me, but she was already up. Ashley and I napped in our bedroom. When we got up Eli and the other boys were in their bedroom. Ashley went and got Eli and took him downstairs. Then Ashley came back upstairs. She told me she had put Eli on the couch in the living room. Ashley then went to the bathroom upstairs. While Ashley was in the bathroom Eli started crying downstairs. He

-4-

was crying really loud. He was crying louder than normal. I went downstairs, and when I got to the bottom of the stairs Eli was at the bottom of the stairs. He was on the other side of the baby gate. The baby gate runs across the bottom of the stairs to keep Eli from going up the stairs. Eli was sitting on the floor. He was crying loud. I stepped over the baby gate. I jerked him up, and when I did he hit his head on the handrail. Even after he hit his head on the handrail he wouldn't stop crying. I lost my temper and I hit his head on the wall opposite of the handrail. I hit his head against the corner of the wall on the opposite side of the handrail. I hit his head against the wall hard. When I hit his head against the wall he went limp in my arms. His eyes rolled back in his head, and he just went limp. When he went limp I got scared and took him up to Ashley. I just told Ashley that Eli had gone limp. She told me to call 911, and I did. I waited outside the apartment for the ambulance. Ashley waited outside the apartment with me, and she was holding Eli in her arms. He never woke up before the ambulance got there. In the past I've been too rough with Eli. I've lost my temper with him some in the past. About a week ago Eli was in his crib and he was throwing things at me, and it made me mad. I got up and went over to the crib and I took his head and hit it up against the side of the crib. He just cried real loud, and I gave him his bottle. I knew then I had hit him too hard, and I was rubbing the back of his head. I've never seen Ashley be rough with Eli or the other two boys. Ashley has never seen me be rough with the boys. Today I just lost my temper a bit. It would be fair to say that any injuries Eli has I caused.

After finishing at TBI headquarters, Chief Hopper and Agent Winkler accompanied Defendant back to Defendant's Carthage apartment. Defendant executed a written consent to search. Officers photographed the interior of Defendant's apartment during the search. Defendant also agreed to demonstrate his actions toward the victim. Agent Winkler described the demonstration during his testimony at trial:

Well, he demonstrated hitting the child's head as he picked the child up, hitting the child's head on the hand rail, and then he demonstrated taking the child and hitting the child's head up against the wall. Now, what he described to us when he demonstrated it to us there at the apartment, he said that he hit the – he hit Eli's head against this wall here [referring to a wall in a photograph of the stairwell area].

That was different than what he had told in his written statement to us because in the written statement, he described hitting the child's head on the hand rail and then hitting Eli's head against the opposite wall, is what he described in his written statement.

-5-

Agent Winkler testified that the information law enforcement officers received from the victim's attending physicians and from the medical examiner about the victim's injuries "was consistent with what [Defendant] had said." After completing the search and the demonstration, law enforcement personnel left, allowing Defendant to remain at his apartment. On cross-examination, Chief Hopper acknowledged that the other children in Defendant's apartment appeared to be "fine." He also recalled that Defendant inquired repeatedly about the victim's condition.

Dr. Bradly Strohler, a pediatric intensivist[1] in the critical care unit at Vanderbilt, treated the victim upon his arrival from Carthage General Hospital. Dr. Strohler testified that the victim "had significant evidence of brain damage" and that his "fundamental drive to breath[e] was . . . impaired." A CT scan of the victim's brain "showed evidence of swelling at that point and some amounts of hemorrhage and bleeding." Dr. Strohler confirmed that the victim died at Vanderbilt on August 31, 2004, the day after he arrived. Dr. Strohler diagnosed the primary cause of the victim's death as "brain herniation," and stated that secondary diagnoses included "shock and hypotension, bilateral retinal hemorrhages consistent with shaken baby syndrome, and multiple bruises consistent with nonaccidental trauma." Dr. Strohler opined that bruising on the victim's earlobes indicated that they had been "grabbed forcibly," and he explained that this sort of bruising typically occurs "when a child is being lifted or moved by the earlobes." Dr. Strohler had read the written signed statement Defendant gave at TBI headquarters and testified that the victim's injuries were consistent with the actions described therein. During cross-examination, in response to questions about "shaken baby syndrome," Dr. Strohler stated that, "[i]n this situation, slung into a wall or having his head struck against a wall or a corner of a crib, those sorts of things, would also account for these symptoms. The shaking itself isn't necessarily the mechanism."

Dr. Bruce Levy, medical examiner, performed an autopsy of the victim. Referring to photographs taken during the autopsy, Dr. Levy indicated five discrete areas of bruising on the victim's body: (1) "numerous injuries in and around both of his ears;" (2) bruising in both shoulder areas; (3) a large bruise on his right leg; (4) bruising on his lower back; and (5) "a large scrape and bruise or abrasion and contusion" on the back of the victim's head. After reviewing Defendant's written statement, Dr. Levy opined that the victim's injuries were consistent with Defendant's confessed actions. Dr. Levy also opined that the victim "died as a result of blunt impact injuries to the head, either his head was struck or, as the statement reads, his head was struck into an object." Elaborating, Dr. Levy explained that the injuries Defendant inflicted "caused the [victim's] brain then to swell. . . . The swelling and the blood collecting underneath [the victim's skull] caused irreversible damage to [the victim's] brain which then led to his death." Dr. Levy "ruled the manner of death was a homicide."

---

[1] According to Dr. Strohler, "the role of the intensivist is to take care of children that are too sick for routine hospital care."

However, on cross-examination, Dr. Levy acknowledged that the bruising on the victim's chest area could have been caused by efforts to resuscitate him.

Several witnesses testified on behalf of Defendant. Eudelle Mundy, Defendant's first grade school teacher and his ninth and tenth grade guidance counselor, said that she had "never heard anything negative about" Defendant and stated that "[h]e's always just been a sweet, sensitive young man as far as" she knew. When confronted with Defendant's written statement, she responded, "[t]hat is not the Nigel that I know." Richard Brower testified that he had known Defendant "just about since he's been born." Mr. Brower testified that Defendant "wouldn't hurt a fly." Daniel Watkins, Defendant's younger brother, described Defendant as "a very peaceful person" and said he had "never seen any kind of violence out of [Defendant] whatsoever."

Based on the foregoing proof, on count one of the indictment charging first degree felony murder during the perpetration of aggravated child abuse, the jury convicted Defendant of the lesser included offense of reckless homicide, a Class D felony. On the second count of the indictment, the jury convicted Defendant of the charged offense, aggravated child abuse, a Class A felony. After a sentencing hearing, the trial court imposed a four-year sentence of incarceration for Defendant's reckless homicide conviction and a twenty-five-year consecutive sentence for Defendant's aggravated child abuse conviction.

Defendant appealed, challenging the trial court's denial of the motion to suppress the statement he gave at TBI headquarters on August 30, 2004; the trial court's admission of autopsy photographs; the sufficiency of the evidence to support his convictions; and the propriety of his sentences. The Court of Criminal Appeals determined on its own motion that Defendant's dual convictions violated the double jeopardy prohibitions of the United States and Tennessee Constitutions. Accordingly, the Court of Criminal Appeals merged the reckless homicide conviction into the aggravated child abuse conviction and also remanded for resentencing, but did not otherwise grant relief. State v. Watkins, No. M2009-00348-CCA-R3-CD, 2010 WL 682506, at *1 (Tenn. Crim. App. Dec. 8, 2009).

We granted the State's application for permission to appeal to address the double jeopardy issue.[2] Following briefing, oral argument, and a careful study of Tennessee law governing the issue presented, we ordered the parties in this appeal, and two other pending

_____

[2] Defendant raised no additional issues in either his response to the State's application for permission to appeal or in his supplemental briefs to this Court following our grant of the State's application. We therefore decline to address on their merits any of the issues Defendant raised in the Court of Criminal Appeals.

appeals involving related issues,[3] to submit additional briefs. In particular, we directed the parties to address specific questions concerning the tests that courts apply in single prosecution cases when determining whether separate convictions under different statutes constitute the same offense and violate the double jeopardy protection against imposing multiple punishments.[4] We also scheduled consolidated reargument[5] and invited certain prosecutorial and defense organizations to submit amicus curiae briefs.

## DOUBLE JEOPARDY

### A. Standard of Review

Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness. See State v. Thompson, 285 S.W.3d 840, 846 (Tenn. 2009).

### B. Historical Development

Prohibitions against double jeopardy originated in antiquity.[6] In 355 B.C., the Greek orator Demosthenes declared that "'the laws forbid the same [person] to be tried twice on the same issue.'"[7] The Digest of Justinian, a codification of Roman law produced in 533 A.D.,[8] similarly provided that "'[t]he governor must not allow a man to be charged with the same offenses of which he has already been acquitted,'"[9] and that "'a person cannot be charged on

---

[3] State v. Cross, No. E2008-02792-SC-R11-CD, 2010 Tenn. LEXIS 1102 (Tenn. Nov. 10, 2010) (order granting Tennessee Rule of Appellate Procedure 11 application); State v. White, No. E2009-00941-SC-R11-CD, 2010 Tenn. LEXIS 974 (Tenn. Oct. 12, 2010) (order granting Tennessee Rule of Appellate Procedure 11 application).

[4] State v. Watkins, No. M2009-00348-SC-R11-CD (Tenn. Aug. 24, 2011) (order directing supplemental briefing, inviting amicus curiae participation, and setting reargument).

[5] This appeal was initially heard on February 3, 2011, but was reargued on November 1, 2011.

[6] David S. Rudstein, A Brief History of the Fifth Amendment Guarantee Against Double Jeopardy, 14 Wm. & Mary Bill Rts. J. 193, 196-202 (2005) [hereinafter Rudstein, 14 Wm. & Mary Bill Rts. J.].

[7] Rudstein, 14 Wm. & Mary Bill Rts. J. at 198 (quoting Demosthenes, Against Leptines, in Olynthiacs, Philippics, Minor Public Speeches, Speech Against Leptines, XX § 147, at 589 (J.H. Vince trans., Harvard Univ. Press 1998) (1930)).

[8] Rudstein, 14 Wm. & Mary Bill Rts. J. at 199.

[9] Rudstein, 14 Wm. & Mary Bill Rts. J. at 199 n.47 (quoting Dig. 48.2.7.2 (Ulpian, De Officio (continued...)

account of the same crime under several statutes.'"[10] Accordingly, Justice Hugo Black observed over fifty years ago that "[f]ear and abhorrence of governmental power to try people twice for the same conduct is one of the oldest ideas found in western civilization. Its roots run deep into Greek and Roman times." Bartkus v. Illinois, 359 U.S. 121, 151-52 (1959) (Black, J., dissenting).[11]

The precise origin and implementation of the prohibition against double jeopardy within the English common law is uncertain.[12] However, in a 1610 decision, Lord Edward Coke declared that "'[n]emo debet bis puniri pro uno delicto'—'no one should be punished twice for the same offence.'"[13] By the eighteenth century, Lord William Blackstone declared that it had become a "universal maxim of the common law of England, that no man is to be brought into jeopardy of his life more than once for the same offence."[14] "Lords Coke's and Blackstone's formulation of the double jeopardy protection encompassed four discrete safeguards: prohibiting reprosecution for the same offense upon either a prior acquittal (autrefois acquit), a prior conviction (autrefois convict), a former pardon, and a previous conviction on a lesser-included offense (autrefois attaint)."[15]

---

[9](...continued)
Proconsulis 7), in 4 The Digest of Justinian 797 (Theodor Mommsen et al. eds., Univ. of Pa. Press 1985) (1870)).

[10] Rudstein, 14 Wm. & Mary Bill Rts. J. at 199 n.48 (quoting Dig. 48.2.14 (Paulus, De Officio Proconsulis 2), in 4 The Digest of Justinian 799 (Theodor Mommsen et al. eds., Univ. of Pa. Press 1985) (1870)).

[11] See also Whalen v. United States, 445 U.S. 684, 699 (1980) (Rehnquist, J., dissenting) ("Historians have traced the origins of our constitutional guarantee against double jeopardy back to the days of Demosthenes . . . ."); Benton v. Maryland, 395 U.S. 784, 795 (1969) (noting that the origins of the guarantee against double jeopardy "can be traced to Greek and Roman times").

[12] Rudstein, 14 Wm. & Mary Bill Rts. J. at 202-21 (discussing the development of the double jeopardy prohibition in English common law).

[13] Carissa B. Hessick and F. Andrew Hessick, Double Jeopardy as a Limit on Punishment, 97 Cornell L. Rev. 45, 50 n.21 (Nov. 2011) [hereinafter Hessick, 97 Cornell L. Rev.] (quoting Dr. Bonham's Case, (1610) 77 Eng. Rep. 638 (K.B.) 654).

[14] 4 William Blackstone, Commentaries *335-36; see also Rudstein, 14 Wm. & Mary Bill Rts. J. at 220-221.

[15] Alfredo Garcia, The Fifth Amendment: A Comprehensive and Historical Approach, 29 U. Tol. L. Rev. 209, 236 (1998) (citing 4 William Blackstone, Commentaries *335 (N.Y. & London, Garland 1978) (1790); Sir Edward Coke, The Third Part of the Institutes of the Laws of England 212-14 (4th ed. London, John Moore 1635); Matthew Hale, 2 The History of the Pleas of the Crown 240 (Phila., R.H. Small 1847)); see also United States v. Wilson, 420 U.S. 332, 340 (1975).

Prohibitions against double jeopardy also developed in Colonial American law.[16] Colonial Massachusetts and Connecticut adopted laws expressly providing protections against double jeopardy.[17] Other colonies allowed defendants threatened with "multiple prosecutions to plead autrefois acquit [prior acquittal] or autrefois convict [prior conviction]."[18]

*C. United States Constitution*

Not surprisingly, given its longstanding recognition, the Founders included protection against double jeopardy in the Bill of Rights to the United States Constitution.[19] The Double Jeopardy Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment,[20] provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This succinct and seemingly straightforward language has yielded a body of case law that has been described as "a veritable Sargasso Sea[21] which could not fail to challenge the most intrepid judicial navigator." Albernaz v. United States, 450 U.S. 333, 343 (1981); see also Yeager v. United States, 557 U.S. 110, ___, 129 S. Ct. 2360, 2365 (2009) (recognizing that the Court has "decided an exceptionally large number of cases interpreting" the Double Jeopardy Clause and citing United States v. DiFrancesco, 449 U.S. 117, 126-27 (1980) (collecting cases)). The first step in successfully traversing the sea of case law is to identify the precise double jeopardy protection implicated.

---

[16] See Rudstein, 14 Wm. & Mary Bill Rts. J. at 221-23 (discussing the development of double jeopardy prohibitions in Colonial America); Hessick, 97 Cornell L. Rev. at 51 (same).

[17] See Rudstein, 14 Wm. & Mary Bill Rts. J. at 222; Hessick, 97 Cornell L. Rev. at 51.

[18] See Hessick, 97 Cornell L. Rev. at 51.

[19] See Rudstein, 14 Wm. & Mary Bill Rts. J. at 226-32 (discussing the history and adoption of the Fifth Amendment Double Jeopardy Clause); Hessick, 97 Cornell L. Rev. at 51 (same); George C. Thomas, A Unified Theory of Multiple Punishment, 47 U. Pitt. L. Rev. 1, 3 n.3 (1985) [hereinafter Thomas, 47 U. Pitt. L. Rev.] (same).

[20] Benton, 395 U.S. at 794.

[21] The Sargasso Sea is part of the North Atlantic Ocean. Described as elliptical in shape and strewn with a brown floating seaweed, it "was first mentioned by Christopher Columbus, who crossed it on his initial voyage in 1492. The presence of the seaweed suggested the proximity of land and encouraged Columbus to continue, but many early navigators had the fear (actually unfounded) of becoming entangled within the mass of floating vegetation." Sargasso Sea. Encyclopedia Britannica Online. http://www.britannica.com/EBchecked/topic/524237/Sargasso-Sea. (last visited Mar. 7, 2012).

The Double Jeopardy Clause has been interpreted as providing three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense.[22] North Carolina v. Pearce, 395 U.S. 711, 717 (1969) abrogated on other grounds by Alabama v. Smith, 490 U.S. 794 (1989); see also Dep't of Revenue v. Kurth Ranch, 511 U.S. 767, 769 n.1 (1994); Schiro v. Farley, 510 U.S. 222, 229 (1994); Ohio v. Johnson, 467 U.S. 493, 498 (1984); Justices of Bost. Mun. Ct. v. Lydon, 466 U.S. 294, 306-07 (1984). This appeal involves the third category of protection afforded by the Double Jeopardy Clause—protection against multiple punishments for the same offense imposed in a single prosecution.

The Supreme Court decision most often cited as recognizing this third category of protection is Ex Parte Lange, 85 U.S. 163, 170 (1873).[23] Lange was convicted of a criminal offense for which a statute authorized a maximum sentence of either one year imprisonment or a maximum $200 fine, but not both. Ex Parte Lange, 85 U.S. at 175. Despite this statutory limitation, the trial judge mistakenly imposed both a fine and a sentence of incarceration. Id. After Lange paid the fine and served five days of the prison sentence, the trial judge realized his error, vacated the original sentence, and resentenced Lange to one year in prison. Id. The Supreme Court reversed, reasoning that imposition of a sentence of incarceration would punish Lange twice for a single offense. Id. The Court explained that "when the prisoner, as in this case, by reason of a valid judgment, had fully suffered one of the alternative punishments to which the law alone subjected him, the power of the court to punish further was gone." Id. at 176. The Double Jeopardy Clause, the Court concluded,

---

[22] In addition to these categories of protection, two "vitally important interests" underlie the Double Jeopardy Clause. Yeager, 557 U.S. at ___, 129 S. Ct. at 2365.

> The first [interest] is "the deeply ingrained" principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." The second interest is the preservation of "the finality of judgments."

Yeager, 557 U.S. at ___, 129 S. Ct. at 2365-66 (citations omitted). Neither of these interests is implicated in this appeal.

[23] Yeager, 557 U.S. at ___, 129 S. Ct. at 2365 (identifying Ex Parte Lange as the decision that interpreted the Double Jeopardy Clause as providing protection against multiple punishments in the same prosecution); Kurth Ranch, 511 U.S. at 798-99 (Scalia, J., dissenting) (tracing the history of the protection against multiple punishment in a single prosecution to Ex Parte Lange and discussing the case); Anne Bowen Poulin, Double Jeopardy and Multiple Punishment: Cutting the Gordian Knot, 77 U. Colo. L. Rev. 595, 614 (2006) (identifying Ex Parte Lange as "the decision most pervasively cited for the proposition that the Double Jeopardy Clause prohibits multiple punishments, even if imposed in a single proceeding").

"was designed as much to prevent the criminal from being twice punished for the same offence as being twice tried for it." Id. at 173; see also id. at 178 (stating that common law, the Constitution, and "the dearest principles of personal rights" all forbade the action of the trial court). Thus, in determining whether Lange's rights under the Double Jeopardy Clause had been violated, the Court focused upon the punishment authorized by the statute and emphasized the trial court's lack of authority to impose a punishment in excess thereof. Id. at 176.

Legislative intent with respect to punishment remains the focus of the analysis when a defendant in a single prosecution relies upon the Double Jeopardy Clause's protection against multiple punishments. The United States Supreme Court has declared that "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Missouri v. Hunter, 459 U.S. 359, 366 (1983). "[T]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended . . . to impose multiple punishments, imposition of such sentences does not violate the Constitution." Albernaz, 450 U.S. at 344 (footnote omitted). The Double Jeopardy Clause does not limit the legislative authority to define criminal offenses and to prescribe punishments. See Brown v. Ohio, 432 U.S. 161, 165 (1977) ("The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments . . . ."). This is true because "within our federal constitutional framework the legislative power, including the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress." Whalen, 445 U.S. at 689.

Thus, in single prosecution cases, the double jeopardy prohibition against multiple punishments functions to prevent prosecutors and courts from exceeding the punishment legislatively authorized. See Albernaz, 450 U.S. at 344; Brown, 432 U.S. at 165.[24] "If a federal court exceeds its own authority by imposing multiple punishments not authorized by Congress, it violates not only the specific guarantee against double jeopardy, but also the constitutional principle of separation of powers in a manner that trenches particularly harshly on individual liberty." Whalen, 445 U.S. at 689. "Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct . . . a court's task of statutory construction is at an end and . . . the trial court or jury may impose cumulative punishment under such statutes in a single trial." Hunter, 459 U.S. at 368-69.

---

[24] See also State v. Blackburn, 694 S.W.2d 934, 936 (Tenn. 1985) (noting that the United States Supreme Court has "made it clear that the 'final component' of double jeopardy protection against cumulative punishments, as contrasted with that against multiple trials, is designed to insure that courts restrict themselves in sentencing to the limits established by the legislature").

Legislative intent, however, is not always clear. As a canon of statutory construction, the United States Supreme Court presumes "that where two statutory provisions proscribe the 'same offense,' a legislature does not intend to impose two punishments for that offense." Rutledge v. United States, 517 U.S. 292, 297 (1996) (quoting Whalen, 445 U.S. at 691-92) (internal quotation marks omitted). Of course, in order to apply this presumption, courts must first determine whether two statutory provisions proscribe the "same offense." The analysis courts apply to answer this question depends upon the type of multiple punishment claim being addressed.

In single prosecutions, multiple punishment claims ordinarily fall into one of two categories, frequently referred to as "unit-of-prosecution" and "multiple description" claims. See State v. Schoonover, 133 P.3d 48, 60-61 (Kan. 2006); State v. Gallegos, 254 P.3d 655, 662 (N.M. 2011); Childress v. State, 285 S.W.3d 544, 549 n.2 (Tex. Ct. App. 2009); State v. Ramos, 217 P.3d 384, 388-89 (Wash. Ct. App. 2009); State v. Derango, 613 N.W.2d 833, 841-42 (Wis. 2000); Tucker v. State, 245 P.3d 301, 312 (Wyo. 2010); Thomas, 47 U. Pitt. L. Rev. at 12. For ease of reference, we also adopt these terms.

Unit-of-prosecution claims arise when defendants who have been convicted of multiple violations of the *same* statute assert that the multiple convictions are for the "same offense."[25] When addressing unit-of-prosecution claims, courts must determine "what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment." Thomas, 47 U. Pitt. L. Rev. at 11; see also Universal C.I.T. Credit Corp., 344 U.S. at 221 (describing the only issue before the Court as "[w]hat Congress has made the allowable unit of prosecution"); United States v. Weathers, 186 F.3d 948, 952 (D.C. Cir. 1999) ("Where two violations of the same statute rather than two violations of different statutes are charged, courts determine whether a single offense is involved not by applying the Blockburger test, but rather by asking what act the legislature intended as the 'unit of prosecution' under the statute."); State v. Lewis, 958 S.W.2d 736, 739 (Tenn. 1997) ("The legislature has the power to create multiple 'units of prosecution' within a single statutory offense, but it must do so clearly and without ambiguity."). Courts apply the "rule of lenity" when resolving unit-of-prosecution claims, meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to

---

[25] See, e.g., Bell v. United States, 349 U.S. 81 (1955) (holding that transporting two women across state lines for immoral purposes in a single transaction constituted the same offense, i.e., one violation of the Mann Act, not two); United States v. Universal C.I.T. Credit Corp., 344 U.S. 218 (1952) (explaining that a managerial decision was one offense under the Fair Labor Standards Act even though it resulted in underpayment to more than one employee over a course of weeks); Ebeling v. Morgan, 237 U.S. 625 (1915) (upholding six convictions based upon defendant's cutting into six mail bags in a single transaction because Congress intended punishment for each act of damage to a mail bag); In re Snow, 120 U.S. 274 (1887) (holding that a continuous thirty-five-month period of co-habitation is one offense because Congress did not create separate offenses based on temporal distinctions).

authorize multiple units of prosecution.  See Gore v. United States, 357 U.S. 386, 391-92 (1958) (recognizing that the rule of lenity may be applied in resolving unit-of-prosecution claims); see also Thomas, 47 U. Pitt. L. Rev. at 17 ("[A]ny ambiguity in defining the unit of conduct must be resolved against the conclusion that each physical action is a separate violation.").

Defendant has been convicted of violating two *different* statutes; thus, the Defendant's appeal involves a multiple description claim—the second category.  Multiple description claims arise in cases in which defendants who have been convicted of multiple criminal offenses under *different* statutes allege that the convictions violate double jeopardy because the statutes punish the "same offense."  See, e.g., Albernaz, 450 U.S. at 336-39 (holding that Congress intended to permit dual convictions of conspiracy to import marijuana and conspiracy to distribute marijuana even though such violations arose from a single agreement or conspiracy having dual objectives);  Gore, 357 U.S. at 390-91 (holding that the defendant's three convictions under different statutes did not violate the Double Jeopardy Clause, even though they were based on a single sale of narcotics, because Congress had proscribed three offenses); Morgan v. Devine,  237 U.S. 632, 638 (1915) (upholding dual convictions of larceny and burglary based on a finding that Congress "manifest[ly] . . . intended to describe separate and distinct offenses"); see also Schoonover, 133 P.3d at 60; Thomas, 47 U. Pitt. L. Rev. at 12.

In multiple description cases, when determining whether two statutes define the same offense, the United States Supreme Court long ago declared that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  Blockburger v. United States, 284 U.S. 299, 304 (1932); see also Rutledge, 517 U.S. at 297 (stating that the Court has applied Blockburger for over a half century to determine whether a defendant has been punished twice for the "same offense").  The Blockburger test requires an examination of the statutory elements in the abstract, without regard to the proof offered at trial in support of the offenses.  See United States v. Dixon, 509 U.S. 688, 696 (1993) ( "T]he same-elements test, sometimes referred to as the 'Blockburger' test, inquires whether each offense contains an element not contained in the other . . . ."); Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975) ("As Blockburger and other decisions applying its principle reveal . . . the Court's application of the test focuses on the statutory elements of the offense.") (citations omitted).  If each offense includes an element that the other offense does not, "the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes."  Iannelli, 420 U.S. at 785 n.17; see also  Illinois v. Vitale, 447 U.S. 410, 416 (1980) (recognizing that the Blockburger test "focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial").

-14-

The Blockburger test has been credited with serving at least two purposes. See Schoonover, 133 P.3d at 62. First, the Blockburger test is described as remaining "loyal" to the text of the Double Jeopardy Clause, which proscribes multiple punishment for the "same offense" and does not proscribe multiple punishment for the "same conduct." Schoonover, 133 P.3d at 62 (citing Dixon, 509 U.S. at 704). Second, the Blockburger test has been characterized as preserving the appropriate separation of powers by focusing the analysis upon legislative intent, rather than upon a defendant's conduct or the proof introduced at a particular trial. See Schoonover, 133 P.3d at 62 (citing Whalen, 445 U.S. at 689).

The Blockburger test also has been described as promoting "two important practical implications." Thomas, 47 U. Pitt. L. Rev. at 35. First, because the Blockburger test evaluates the statutory elements of the offenses without reference to the proof offered at trial, "a motion to dismiss one count or one indictment based on multiple punishment grounds can be decided prior to trial by simply comparing the statutes, and a defendant who is charged improperly will not have to undergo the anxiety of a trial before the error is redressed." Id. at 36. Second, because the Blockburger test focuses on statutory elements rather than proof, "a court can review a multiple punishment claim without a time-consuming review of the trial transcript." Id.

The Blockburger test involves a two-step process. First, the threshold inquiry under Blockburger is whether the alleged statutory violations arise from "the same act or transaction." See Blockburger, 284 U.S. at 301-04 (considering first whether two sales made to the same person arose from "the same act or transaction" before determining whether "the same act or transaction" constituted "a violation of two distinct statutory provisions"); see also State v. Thompson, 495 A.2d 1054, 1058 (Conn. 1985); Schoonover, 133 P.3d at 62; State v. Matey, 891 A.2d 592, 599 (N.H. 2006); George C. Thomas III, A Blameworthy Act Approach to the Double Jeopardy Same Offense Problem, 83 Cal. L. Rev. 1027, 1035 n.34 (1995) (noting that the "threshold same-act requirement must be satisfied before it makes sense to compare statutory act-types"). This "inquiry does not determine whether there *is* a double jeopardy violation; rather it determines only if there *could be* a violation." Schoonover, 133 P.3d at 62. When a court determines that separate convictions do not arise from the same act or transaction, then there cannot be a double jeopardy violation; thus, courts need not proceed to the second step of the Blockburger test. See, e.g., Matey, 891 A.2d at 599 ("For double jeopardy purposes, the two violations cannot be the 'same offense,' as they do not even meet the threshold requirement of the Blockburger test that the violations arise out of the 'same act or transaction.'"); State v. Armendariz, 141 P.3d 526, 532 (N.M. 2006) ("The first part of the [Blockburger] test requires the determination of whether the conduct underlying the offenses is unitary. If it is, we proceed to the second part of the test, which requires us to examine the relevant statutes to determine whether the Legislature intended to create separately punishable offenses.").

Where the threshold is met, meaning the convictions arose from the same act or transaction, a court next examines the statutes to determine whether the crimes of which the defendant was convicted constitute the same offense. Blockburger, 284 U.S. at 304.[26] Where each statutory offense includes an element not contained in the other, the offenses are distinct. Id.; see also Dixon, 509 U.S. at 696. Where the offenses are distinct under Blockburger, the legislature is presumed to have intended to allow the offenses to be punished separately. See Albernaz, 450 U.S. at 339; Whalen, 445 U.S. at 691-92.

The United States Supreme Court has made it clear that the presumptions supplied by Blockburger, either in favor of multiple punishment if the statutory offenses are distinct, or against multiple punishment if the statutory offenses are the same, may be overcome by explicit declarations of legislative intent. See, e.g., Hunter, 459 U.S. at 368-69 (recognizing that even when statutes proscribe the same offense under Blockburger, the presumption against multiple punishment will be overcome by a specific legislative authorization permitting cumulative punishment); Albernaz, 450 U.S. at 340 ("[T]he [Blockburger] rule should not be controlling where . . . there is a clear indication of contrary legislative intent.").

The vast majority of our sister states utilize the Blockburger test when determining whether two offenses are the same under their respective state law double jeopardy prohibition, regardless whether the double jeopardy protection is afforded by the state constitution, a state statute, or state common law.[27]

---

[26] To be precise and foster clarity in Tennessee law, we deem it important here to emphasize that the second step of the Blockburger test is of no value when adjudicating unit-of-prosecution claims that involve multiple convictions under the *same* statute. See Thomas, 47 U. Pitt. L. Rev. at 24 n.115 ("It is . . . impossible to apply the required evidence test literally to multiple violations of a single statute; one cannot ascertain whether 'each provision requires proof of a fact which the other does not,' [Blockburger,] 284 U.S. at 304, when only one statutory provision is involved."); see also Tucker, 254 P.3d at 312 ("[I]n cases that involve two violations of the same statute, the 'same elements' test does not apply. Instead, when two violations arise from the same statute, we look directly to the intent of the legislature to determine the appropriate 'unit of prosecution.'").

[27] See Lorance v. State, 770 So. 2d 644, 648 (Ala. Crim. App. 1999); State v. Eagle, 994 P.2d 395, 397 (Ariz. 2000); Cothren v. State, 42 S.W.3d 543, 548 (Ark. 2001); People v. Reed, 137 P.3d 184, 186-88 (Cal. 2006); People v. Gordon, 160 P.3d 284, 286-87 (Colo. App. 2007); State v. Brown, 11 A.3d 663, 672-73 (Conn. 2011); Johnson v. State, 5 A.3d 617, 620-21 (Del. 2010); Ivey v. State, 47 So. 3d 908, 910 (Fla. Dist. Ct. App. 2010); Drinkard v. Walker, 636 S.E.2d 530, 532 (Ga. 2006); State v. Feliciano, 115 P.3d 648, 657-58 (Haw. 2005); People v. Dinelli, 841 N.E.2d 968, 978-79 (Ill. 2005); State v. Perez, 563 N.W.2d 625, 627-29 (Iowa 1997); State v. Daniels, 588 N.W.2d 682, 684 (Iowa 1998); Schoonover, 133 P.3d at 78; State v. Williams, 395 A.2d 1158, 1167 (Me. 1978); Marquardt v. State, 882 A.2d 900, 930-31 (Md. 2005); Commonwealth v. Rabb, 725 N.E.2d 1036, 1041 (Mass. 2000); People v. Garland, 777 N.W.2d 732, 734 (Mich. Ct. App. 2009); State v. Holmes, 778 N.W.2d 336, 340-41 (Minn. 2010); Traylor v. State, 72 So. 3d 531, 532 (Miss. Ct. App. 2011); Yates v. State, 158 S.W.3d 798, 801-02 (Mo. Ct. App. 2005); State v.

(continued...)

*D. Tennessee Constitution*

This Court has not adopted the Blockburger test when determining whether two offenses are the same under the Double Jeopardy Clause of the Tennessee Constitution. Tenn. Const. art. I, § 10. Rather, Tennessee currently applies a unique test[28] consisting of four factors that are weighed to determine whether multiple convictions violate double jeopardy. See State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996). As will be discussed more fully hereinafter, under the four-factor Denton test, Tennessee courts first compare the statutory elements in the abstract, as Blockburger directs. Next, applying the principles of Duchac v. State, 505 S.W.2d 237 (Tenn. 1973), Tennessee courts consider whether the same evidence was used to establish the offenses. Third, Tennessee courts consider whether the offenses involved multiple victims or discrete acts. Finally, Tennessee courts determine

---

(...continued)

Wardell, 122 P.3d 443, 446 (Mont. 2005); State v. Huff, 776 N.W.2d 498, 501-02 (Neb. 2009); Wilson v. State, 114 P.3d 285, 294 (Nev. 2005); State v. Lee, 213 P.3d 509, 511-12 (N.M. Ct. App. 2009); State v. Ezell, 582 S.E.2d 679, 682 (N.C. Ct. App. 2003); State v. Moos, 758 N.W.2d 674, 678 (N.D. 2008); Logsdon v. State, 231 P.3d 1156, 1165 (Okla. Crim. App. 2010); Commonwealth v. Caufman, 662 A.2d 1050, 1052 (Pa. 1995); State v. Marsich, 10 A.3d 435, 442 (R.I. 2010); State v. Elders, 688 S.E.2d 857, 861 (S.C. Ct. App. 2010); State v. Deneui, 775 N.W.2d 221, 247-48 (S.D. 2009); Pomier v. State, 326 S.W.3d 373, 385 (Tex. Ct. App. 2010); State v. Franklin, 735 P.2d 34, 35-36 (Utah 1987); Coleman v. Commonwealth, 539 S.E.2d 732, 734 (Va. 2001); In re Borrero, 167 P.3d 1106, 1108 (Wash. 2007); State v. Proctor, 709 S.E.2d 549, 558-59 (W. Va. 2011); State v. Derango, 613 N.W.2d 833, 841-42 (Wis. 2000); Tucker v. State, 245 P.3d 301, 311-12 (Wyo. 2010).

Other states' approaches vary. New Hampshire courts "review and compare the statutory elements of the charged offenses in light of the actual allegations contained in the indictments." State v. MacLeod, 685 A.2d 473, 476 (N.H. 1996). Vermont's constitution provides no state constitutional protection against double jeopardy, and statutory protection in Vermont affords double jeopardy protection only in the case of acquittal. State v. Corey, 561 A.2d 87, 89 (Vt. 1989). Uncertainty exists in Idaho as to the test utilized to determine if there is a violation of the state constitutional prohibition against double jeopardy. State v. Corbus, 256 P.3d 776, 779-83 (Idaho Ct. App. 2011). Courts in Kentucky, New York, and Ohio employ statutory standards which may be stricter than Blockburger with regard to imposing additional limitations on multiple punishments arising from a single prosecution. See Quisenberry v. Commonwealth, 336 S.W.3d 19, 40 (Ky. 2011); Suarez v. Byrne, 890 N.E.2d 201, 209 (N.Y. 2008); State v. Brown, 895 N.E.2d 149, 152-56 (Ohio 2008). Other states employ more exacting standards than Blockburger in single prosecution multiple punishment cases, although some of these standards are only marginally more demanding. See Todd v. State, 917 P.2d 674, 681 (Alaska 1996); Lee v. State, 892 N.E.2d 1231, 1234 (Ind. 2008); State v. Drake, 71 So. 3d 452, 461 (La. Ct. App. 2011); State v. Parker, 762 A.2d 690, 695 (N.J. Super. Ct. App. Div. 2000); see also Alex Tsiatsos, Note, Double Jeopardy Law and The Separation of Powers, 109 W. Va. L. Rev. 527, app. B (2007) (collecting cases).

[28] Susan R. Klein, Double Jeopardy: The History, The Law By George C. Thomas, III, 88 Cal. L. Rev. 1001, 1014 & n.47 (2000) (book review) (describing Tennessee as one of only two states to apply a "conglomeration of various tests thus far proposed" and explaining how Tennessee's test differs from the test New Jersey applies).

-17-

whether the purpose of the respective statutes is the same or different. Denton, 938 S.W.2d at 381; see also State v. Winningham, 958 S.W.2d 740, 743 (Tenn. 1997). "No single aspect of this analysis is given controlling weight," and "each factor must be weighed and considered in relation to the others." Cable v. Clemmons, 36 S.W.3d 39, 42 (Tenn. 2001).

In attempting to apply the four-factor Denton test in this appeal, questions have emerged concerning its analytical soundness and practical effectiveness. Thus, we next undertake a comprehensive review of the Denton test and consider whether either the text or the historical development of the Tennessee Constitution requires adoption of a test different from, or more stringent than, the Blockburger same elements test.

As already noted, the Double Jeopardy Clause of the Fifth Amendment was not applied to the States through the Fourteenth Amendment until 1969. See Benton, 395 U.S. at 794. Nevertheless, with language that has endured unchanged through three state constitutions, and for more than two centuries, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb."[29] We have interpreted the protections afforded by article I, section 10 as "co-extensive" with the Double Jeopardy Clause of the Fifth Amendment. State v. Harris, 919 S.W.2d 323, 327 (Tenn. 1996).[30]

Like its federal counterpart, article I, section 10 protects against three evils: (1) a second prosecution following an acquittal; (2) a second prosecution following a conviction; and (3) multiple punishments for the same offense. Denton, 938 S.W.2d at 378; see also Harris, 919 S.W.2d at 327; State v. Mounce, 859 S.W.2d 319, 321 (Tenn. 1993). As already noted, this appeal implicates the third category—protection against multiple punishments for the same offense. This "third category . . . has presented courts with the greatest challenge." Denton, 938 S.W.2d at 379.

Paralleling the United States Supreme Court's understanding of single prosecution multiple punishment cases, this Court has declared that when "multiple sentences are imposed in a single trial, double jeopardy protection 'is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" Lewis, 958 S.W.2d at 739 (quoting Brown, 432 U.S. at 165). We have emphasized that "[t]he key issue in multiple punishment cases is legislative intent." Denton, 938 S.W.2d at 379; see also State v. Godsey, 60 S.W.3d 759, 777 (Tenn. 2001) ("The key issue is 'whether the legislature intended cumulative punishment.'" (quoting Blackburn, 694

_____

[29] Tenn. Const. art. I, § 10 (1870); Tenn. Const. art. I, § 10 (1835); Tenn. Const. art. XI, § 10 (1796).

[30] We have also noted, however, that federal precedents are "not conclusive" with respect to the proper interpretation of article I, section 10. Thompson, 285 S.W.3d at 847 n.6.

S.W.2d at 936)).  Therefore, "[w]hen the legislature has made its intent clear that cumulative punishment is intended, such as in the case of felony murder and the underlying felony, our [further double jeopardy] analysis . . . is pretermitted." Denton, 938 S.W.2d at 379 n.14 (citation omitted); see also Godsey, 60 S.W.3d at 778 ("Where the Legislature has indicated that cumulative punishment is intended, the double jeopardy analysis need not proceed any further.").

When legislative intent is not clear, however, Tennessee courts have long struggled to articulate a test that consistently and predictably identifies which criminal offenses are the same for purposes of double jeopardy.  See Black, 524 S.W.2d at 921-24 (Henry, J., dissenting) (discussing the confusion and irreconcilable Tennessee cases involving this issue); see also  Bobby Lynch, Jr., Comment, Identity of Criminal Offenses in Tennessee, 43 Tenn. L. Rev. 613, 624 & n.67 (1976) (discussing five Tennessee Supreme Court decisions decided between 1847 and1904 that left the issue "hopelessly confused," in part because the Court did not distinguish between cases involving successive prosecutions and multiple punishment claims).

In Black, a four-to-one decision, this Court sought to clarify the test that courts must apply to determine whether two statutes define the "same offense" for double jeopardy purposes.  The majority in Black considered the Blockburger test, the guidelines included in the American Law Institute's Proposed Official Draft of the Model Penal Code, and the "various tests and rules" discussed in a treatise on criminal law and procedure.  Black, 524 S.W.2d at 919-20.  However, the Court did not "find the formulation of the various 'tests' into catch words, such as 'same transaction' or 'same evidence' to be particularly helpful." Id. at 919.  Rather, the Court declared that "each case requires close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances." Id.  Applying this rule, the majority held that armed robbery and assault with intent to commit second degree murder were distinct and separate offenses.  Id. at 920.  In so holding, the Court noted that "[t]he same evidence was not required to prove the armed robbery as was required to prove the assault with intent to murder," that the "statutory elements of the two offenses are different," and that "neither offense is included within the other."  Id.

Justice Henry concurred with the majority's holding that the two offenses were separate and distinct; however, he dissented from the remainder of the majority opinion. Black, 524 S.W.2d at 920.  Justice Henry explained that the Court  had been "beseeched to address th[e] vexatious and recurring problem" that arises in multiple punishment cases. Id. at 921.  He criticized the majority's failure to "provide sorely needed guidance to the bench and bar of the State," and said the "ad hoc standard" the majority reaffirmed in Black had

already "produced a hodge-podge of decisions which defy logical analysis." Id. at 921-22.[31]

Twenty-one years later, this Court revisited the "vexatious and recurring" question of what test courts should apply to determine whether two statutes constitute the same offense for purposes of double jeopardy. Denton, 938 S.W.2d at 379. The Court in Denton examined Black and the earlier decisions cited therein. Id. at 379-80. The Denton Court described Duchac as involving consideration of "'whether the same evidence is required to prove'" the offenses, and explained that, "'[i]f the same evidence is not required, then the fact that both charges relate to, and grow out of, one transaction, does not make a single offense where two are defined by statutes.'" Id. at 380 (quoting Duchac, 505 S.W.2d 239). Building upon Black and Duchac, the Denton Court ultimately announced the following four-factor test:

> [R]esolution of a double jeopardy punishment issue under the Tennessee Constitution requires the following: (1) a Blockburger analysis of the statutory offenses; (2) an analysis, guided by the principles of Duchac, of the evidence used to prove the offenses; (3) a consideration of whether there were multiple victims or discrete acts; and (4) a comparison of the purposes of the respective statutes.

Id. at 381. The Denton Court explained that "[n]one of these steps is determinative; rather the results of each must be weighed and considered in relation to each other." Id.

Unfortunately, the Denton test has not successfully resolved the "vexatious and recurring" questions regarding this Court's double jeopardy analysis. Not only has its application produced inconsistent results that defy reconciliation, the test itself suffers from analytical defects and an incongruity with the key constitutional consideration in multiple punishment cases—that of ascertaining legislative intent. Furthermore, like earlier tests applied in Tennessee, the Denton test fails to focus sufficiently upon the distinct categories of multiple punishment claims—unit of prosecution and multiple description.[32] Finally, the Denton test rests upon an uncertain constitutional foundation. An examination of each of the Denton factors is appropriate to illuminate the problems described generally above.

---

[31] Justice Henry would have adopted the approach set out in the American Law Institute's Proposed Official Draft of the Model Penal Code. Black, 524 S.W.2d at 928.

[32] See, e.g., Cable, 36 S.W.3d at 43 (applying the Denton test even though the "convictions [did] not involve multiple or distinct statutes").

## E.  First *Denton* Factor

The first Denton factor requires a Blockburger analysis of the statutory offenses. This analysis entails a comparison of the statutory elements of the offenses "in the abstract." Denton, 938 S.W.2d at 381. The first Denton factor is problematic on its face because it begins with the second step of the Blockburger test— a comparison of the statutory elements. It omits the threshold step of the Blockburger test—whether the multiple convictions arise from the same act or transaction.[33] Despite this omission, application of the first Denton factor is straightforward, requiring only a comparison of the statutory elements. The problem with the first Denton factor arises not from its own application, but rather from its application in relation to the second factor—the Duchac factor.

## F.  Second *Denton* Factor

With respect to application of the Duchac factor, inconsistent analytical approaches have developed. This Court indicated in Denton, and has often repeated,[34] that addressing a double jeopardy argument requires "an analysis, guided by the principles of Duchac, of the evidence used to prove the offenses." Denton, 938 S.W.2d at 381. Addressing the respective roles of the Blockburger and Duchac factors, the Denton Court stated:

> Blockburger . . . provides us with an initial test for determining whether two offenses are, in the abstract, the 'same' for double jeopardy purposes. Duchac provides criteria by which we analyze each case to determine whether the offenses are, under the particular circumstances of that case, the "same" for double jeopardy purposes. Black directs that the analysis begin with Blockburger but also clearly requires that the analysis proceed to the circumstances of each individual case.

Id. at 380-81. The Denton Court concluded that "[b]ecause the evidence in this case consisted of a single attack by Denton on the victim, the State necessarily relied on the same evidence to establish both the aggravated assault and the attempted voluntary manslaughter. Thus, application of Duchac indicates that the two offenses are the 'same' for double jeopardy purposes." Id. at 382.

---

[33] The difficulties arising from this omission will be discussed in depth in connection with the third Denton factor.

[34] See, e.g., State v. Stephenson, 195 S.W.3d 574, 588 (Tenn. 2006); Cable, 36 S.W.3d at 42; State v. Beauregard, 32 S.W.3d 681, 683 n.3 (Tenn. 2000); State v. Barney, 986 S.W.2d 545, 549 (Tenn. 1999); Winningham, 958 S.W.2d at 743.

In practice, however, Tennessee Courts have not consistently applied the approach outlined in Denton when analyzing the Duchac factor. For example, in Barney, this Court, addressing the Duchac factor, stated:

> [T]o prove aggravated sexual battery the State must present evidence that the defendant intentionally touched the intimate parts of the child victim and that such touching was for the purpose of sexual gratification. Tenn. Code Ann. §§ 29-13-501, -504. In contrast, rape of a child can be proven solely by evidence of sexual penetration, regardless of the motivation for the act. Tenn. Code Ann. §§ 39-13-501, -522. Thus, different evidence is required to prove each offense, so the offenses are not the same under Duchac.

Barney, 986 S.W.2d at 550. Rather than focusing upon the circumstances of the case, as Denton and Duchac require, the Barney Court focused on the statutory elements of the offenses. See also State v. Thornton, 10 S.W.3d 229, 239 (Tenn. Crim. App. 1999) (conflating the analysis of the first and second Denton factors). In at least three other cases, Stephenson,[35] Goodwin,[36] and Beauregard,[37] this Court similarly conflated the analysis of the

---

[35] Addressing the Duchac factor, we stated:

> [T]he same evidence is not required to prove both offenses. The defendant's conviction for first degree murder required proof of his criminal responsibility for the victim's death and proof of the victim's death. Tenn. Code Ann. § 39-13-202(a)(1) (1989) (premeditated first degree murder). However, his conviction for conspiracy to commit first degree murder required proof of an agreement to commit the murder, not necessarily proof of a killing. Tenn. Code Ann. § 39-12-103(a) (1989) (criminal conspiracy).

Stephenson, 195 S.W.3d at 588.

[36] Addressing the Duchac factor, we stated:

> In order to prove that the defendant committed criminally negligent homicide, the state had to show that a death resulted from the defendant's conduct. On the other hand, for the felony reckless endangerment conviction, the state has to show that an individual or class of individuals entered the zone of danger and that the defendant's conduct placed that person or persons in imminent danger of death or serious bodily injury. Additionally, the state has to show that the defendant used a deadly weapon. Because different evidence was needed to prove each offense, dual convictions would not violate the constitutional prohibitions against double jeopardy.

Goodwin, 143 S.W.3d at 782.

[37] Addressing the Duchac factor, we stated:

(continued...)

first and second <u>Denton</u> factors. Under the approach utilized in these cases, the <u>Duchac</u> factor became meaningless and merely redundant of the first <u>Blockburger</u> factor.

More uncertainty than clarity has resulted when Tennessee courts have endeavored to apply the <u>Duchac</u> factor by reference to the evidence presented at trial, however. For example, in <u>Denton</u>, the Court addressed circumstances in which the defendant initially cut the victim with a knife-like object. 938 S.W.2d at 378. The defendant then stabbed the victim and tried to provoke the victim to fight him. <u>Id.</u> The defendant was convicted of aggravated assault and attempted voluntary manslaughter. <u>Id.</u> As charged and prosecuted, the State relied upon the defendant's use of a deadly weapon, rather than the victim's suffering of serious bodily injury, to establish aggravated assault. <u>Id.</u> at 382 n.19.

Applying the <u>Duchac</u> factor, the <u>Denton</u> Court stated simply that "[b]ecause the evidence in this case consisted of a single attack by Denton on the victim, the State necessarily relied on the same evidence to establish both the aggravated assault and the attempted voluntary manslaughter." <u>Id.</u> at 382. The Court in <u>Denton</u> did not attempt to draw a distinction between the first cut the defendant inflicted upon the victim and the subsequent stabbing. Had such a distinction been drawn, the <u>Denton</u> Court arguably could have viewed the evidence of the stabbing and the defendant's attempt to provoke a fight with the victim as evidence *different* from that used to prove his attempted voluntary manslaughter conviction. The <u>Denton</u> Court did not separate the evidence in this manner, however.

Similarly, the Court in <u>Winningham</u> refused to parse the evidence presented at trial when applying the <u>Duchac</u> factor. In <u>Winningham</u>, the Court addressed whether the defendant's convictions for arson and contempt by violating an order of protection that enjoined the defendant "from coming about petitioner [his estranged wife] for any purpose and specifically from abusing, threatening to abuse petitioner, or committing any acts of violence upon petitioner upon penalty of contempt" constituted multiple punishments for the same offense. 958 S.W.2d at 742. The State presented evidence at trial that, after the entry of the protective order, the defendant threatened to kill the victim, trespassed upon her

---

[37](...continued)
We next consider the evidence required to establish the offenses of rape and incest. We recognize that the same evidence was necessary to establish the element of "sexual penetration" that is essential for both offenses. Since the remaining elements of each offense differ, however, the evidence required to establish each offense necessarily will differ in these material respects. For example, to establish the incest charge, the State had to prove the family relationship between the defendant and the victim. Conversely, to establish the rape charge, the State had to prove the force or coercion and the lack of consent. Thus, the evidence at trial underlying the rape and incest convictions was different and not identical.

<u>Beauregard</u>, 32 S.W.3d at 683 (footnote omitted).

property, shot at her car, and set fire to her house. Id. at 746. This Court concluded that the various acts upon which the contempt and arson convictions were based were inseparable, for purposes of the Duchac factor, weighing in favor of finding a double jeopardy violation. Id.

In contrast to the approach applied in Denton and Winningham, this Court parsed the evidence and found support for multiple convictions in another case involving the violation of a protective order. In Cable, the defendant's former girlfriend declined to spend the night with him. As a result, the defendant:

> became angry, grabbed . . . her hair, and pushed her head against the car window. He then pulled a knife and threatened to kill her. [The victim] pulled to the side of the road and got out of the car. [The defendant] followed her out of the car and then kicked and stabbed the car.

Cable, 36 S.W.3d at 41. However, the Court did not, as it had in Denton and Winningham, group these facts under the label of same evidence. Instead, applying the Duchac factor, the Court concluded that the circumstances of the case depicted three separate incidents, stating:

> [E]vidence to establish the first conviction occurred when an argument began and [the defendant] grabbed [the victim] and pushed her head against the car window. The evidence of the second conviction was that [the defendant] produced a knife and threatened to kill [the victim]. Finally, the evidence of the third conviction was that after [the victim] pulled over and fled from the scene, [the defendant] vandalized her car by kicking it and striking it with a knife.

Cable, 36 S.W.3d at 43; see also State v. Lawrence, 995 S.W.2d 142, 145 (Tenn. Crim. App. 1998) (applying the Duchac factor by parsing the evidence presented at trial).

In addition to the difficulty courts have had in determining how precisely to parse the trial evidence, the Duchac factor has also generated two different approaches as to which evidence should be considered: conduct or non-conduct evidence. For example, in State v. Green, 947 S.W.2d 186, 187 (Tenn. Crim. App. 1997), the defendant had been convicted of driving on a revoked license and driving while prohibited from doing so as a habitual traffic offender. According to the Court of Criminal Appeals, "Officer Greg Branch, previously aware that the defendant had been declared an habitual offender, observed the defendant driving down a residential street. After the defendant turned into a driveway and got out of the driver's side of his car, Officer Branch arrested him." Id. at 190.

-24-

In applying the Duchac factor, the Court of Criminal Appeals considered only the defendant's conduct— driving—in finding that the same evidence had been used to establish both offenses. Id. The intermediate appellate court made no mention of the non-conduct, non-overlapping evidence of the two offenses in its analysis of the Duchac factor. Specifically, to establish the offense of driving on a revoked license, the State had to show that the defendant had been driving on a public highway: to establish the habitual offender violation, the State had to show a prior court order barring the defendant from driving. See id. at 189-90.

Criminal trials often involve both conduct and non-conduct evidence. For example, in a prosecution for incest and another form of sexual assault, both offenses may be based on the same evidence with respect to the defendant's conduct. See Beauregard, 32 S.W.3d at 683. Nonetheless, the same evidence does not support both offenses because the incest conviction alone requires proof of the victim's status—the victim's familial relationship to the defendant. Id. We know of no basis for disregarding such non-conduct evidence when applying the Duchac factor.

As exemplified by the foregoing cases, application of the Duchac factor has fractured into at least three inconsistent approaches. First, the Duchac factor has been applied in a manner that merely replicates the Blockburger factor. Second, when considering the trial evidence, Tennessee courts have differed on whether the evidence should be reviewed broadly or narrowly. Third, Tennessee courts have differed on whether to consider only conduct evidence or both conduct and non-conduct evidence.

In addition to the lack of analytical uniformity in its application, the foremost problem with the Duchac factor is its ineffectiveness in ascertaining legislative intent—the key consideration in multiple punishment cases. Albernaz, 450 U.S. at 344; Hunter, 459 U.S. at 368; Denton, 938 S.W.2d at 379. Indeed, it is difficult to conceive of how reviewing the evidence and circumstances of a particular criminal case aids a court in ascertaining legislative intent with respect to multiple punishments. See Commonwealth v. Vick, 910 N.E.2d 339, 354 (Mass. 2009) ("[J]udicial assessment of the evidence introduced in a single criminal trial of multiple offenses[] runs the risk of unnecessary intrusion into the legislative prerogative to define crimes and fix punishments." (internal quotation marks omitted)).

## G. Third Denton Factor

Analytical problems have also arisen in applying the third Denton factor—whether the offenses involved multiple victims or discrete acts. Denton, 938 S.W.2d at 381. As already suggested, this factor closely resembles the Blockburger threshold inquiry of whether the convictions are based on the same act or transaction. The legal discussion of multiple victims and discrete acts in Denton derives not from cases involving prosecutions under

different criminal statutes (multiple description claims), but rather from cases involving multiple counts under a single statute (unit-of-prosecution claims). See Denton, 938 S.W.2d at 382 (citing State v. Phillips, 924 S.W.2d 662 (Tenn. 1996); State v. Goins, 705 S.W.2d 648 (Tenn. 1986); State v. Irvin, 603 S.W.2d 121 (Tenn. 1980); Grant v. State, 374 S.W.2d 391, 393 (Tenn. 1964); State v. Pelayo, 881 S.W.2d 7 (Tenn. Crim. App. 1994)). As already explained, unit-of-prosecution claims raise a different question—what is the legislative intent with respect to the minimum unit of conduct that may be prosecuted as a separate offense—than that raised by a multiple description claim.

For example, in Goins, even though the defendant received and concealed stolen goods from a burglar who had victimized at least three persons, the Court concluded that the statute did not authorize multiple convictions for the receipt and concealment of the stolen goods. 705 S.W.2d at 650-51. Rather, the relevant statute defined the unit of prosecution as each separate act of receipt or concealment, without regard to the number of victims. Id.; see also Lewis, 958 S.W.2d at 738-39 (applying Goins and holding that multiple convictions for arson were impermissible because the word "structure" in the statute referred to the single apartment building burned, not the separate apartment units in the building); Irvin, 603 S.W.2d at 121-24 (applying a similar analysis to uphold multiple convictions because "the elements of the criminal offense" with which the defendant was charged allowed for separate convictions for second degree murder for each separate victim, even though the victims were killed in a single traffic incident).

When considering multiple description claims, classifying discrete acts and multiple victims as merely one of four factors to be weighed in the balance is problematic. If a defendant's multiple convictions arise under different statutes and are based on discrete acts or involve multiple victims, then the double jeopardy protection against multiple punishment is not implicated. See, e.g., Matey, 891 A.2d at 599 ("Although the alleged drug use violated the same rule of probation on each occasion, the violations were separate and distinct and occurred on different dates. For double jeopardy purposes, the two violations cannot be the 'same offense,' as they do not even meet the threshold requirement of the Blockburger test that the violations arise out of the 'same act or transaction.'"); State v. Saiz, 191 P.3d 521, 529 (N.M. 2008) ("If the acts are sufficiently separated, there is no multiple punishment concern . . . ."), abrogated on other grounds by State v. Belanger, 210 P.3d 783 (N.M. 2009).

### H.  Fourth Denton Factor

The fourth Denton factor requires a comparison of the purposes of the respective statutes. See, e.g., Beauregard, 32 S.W.3d at 684 ("[T]he statutory offenses of rape and incest have a related but separate legislative purpose and achieve contrasting policy objectives"). Similarly, the United States Supreme Court has on occasion "reinforced" its conclusion regarding legislative intent, and the presumption arising from application of the

Blockburger test, by comparing the purposes of the respective statutes. See, e.g., Albernaz, 450 U.S. at 343 (commenting that the "two conspiracy statutes are directed to separate evils"). Thus, by focusing upon the abstract purposes of the respective statutes, the fourth Denton factor provides information pertinent to the crucial consideration—legislative intent.

### I. Constitutional Basis for Denton

The most significant shortcoming of the four-factor test is that the Denton Court failed to explain why article I, section 10 of the Tennessee Constitution requires adoption of a test different from that applied to challenges based upon the Double Jeopardy Clause of the Fifth Amendment. See Denton, 938 S.W. 2d at 381 n.15 (predicating the test on article I, section 10 but providing no further explanation). As the final arbiter of the Tennessee Constitution, this Court may interpret state constitutional provisions more broadly than corresponding provisions of the United States Constitution. See Seals v. State, 23 S.W.3d 272, 277 (Tenn. 2000). Indeed, this Court has departed[38] from federal interpretations of similar constitutional provisions where appropriate interpretive grounds support a different interpretation. See State v. Vineyard, 958 S.W.2d 730, 733-34 (Tenn. 1997) (recognizing that textual differences may support interpreting the Tennessee Constitution differently than the United States Constitution). However, careful study has revealed no textual, historical, or other basis that supports interpreting the Double Jeopardy Clause of article I, section 10 as requiring the adoption of a test different from that applied under the Double Jeopardy Clause of the Fifth Amendment.

First, as already noted, we have described the Double Jeopardy Clause of article I, section 10 as co-extensive with the Double Jeopardy Clause of the Fifth Amendment. Harris, 919 S.W.2d at 327. Second, textual differences between the language of article I, section 10 and the Double Jeopardy Clause of the Fifth Amendment are stylistic only.[39] Third, the language now appearing in article I, section 10 was adopted in 1796,[40] only five years after

---

[38] See, e.g., State v. Jacumin, 778 S.W.2d 430, 435-36 (Tenn. 1989) (adopting a different standard for evaluating the sufficiency of an affidavit submitted in support of a request for a search warrant); State v. Lakin, 588 S.W.2d 544, 549, n.2 (Tenn. 1979) (adopting a different standard under the Tennessee Constitution for the open fields doctrine).

[39] See Black, 524 S.W.2d at 924 (Henry, J., dissenting).

[40] See Tre Hargett, Tennessee Blue Book 2009–2010 536 (discussing the adoption of the 1796 Tennessee Constitutions); Jones v. Greene, 946 S.W.2d 817, 823 (Tenn. Ct. App. 1996) (recognizing that the first Tennessee Constitution was adopted in 1796).

ratification of the Fifth Amendment.[41]  It is logical to infer from the similarity of the language of the two provisions and the temporal proximity of their adoption that the drafters of article I, section 10 were aware of, and influenced by, the Double Jeopardy Clause of the Fifth Amendment.  We have found no authority, nor has any been provided to us, contravening such an inference.[42]  Fourth, no differences between the government of the United States and the government of Tennessee suggest that article I, section 10 requires the adoption of a test different from Blockburger.  Indeed, the constitutional principle of separation of powers, which the Blockburger test preserves, appears explicitly in the Tennessee Constitution.  See Tenn. Const. art. II, § 2.  Like the United States Supreme Court, this Court has recognized that "[t]he power to define what shall constitute a criminal offense and to assess punishment for a particular crime is vested in the legislature."  State v. Burdin, 924 S.W.2d 82, 87 (Tenn. 1996); see also State v. Farner, 66 S.W.3d 188, 200 (Tenn. 2001).

Given the analytical shortcomings of the Denton test and the lack of any textual or historical basis suggesting that the Double Jeopardy Clause of the Tennessee Constitution mandates its adoption, we conclude that the time has come to abandon the Denton test.  We adopt the Blockburger same elements test currently utilized by the federal courts and the vast majority of our sister states.  The Blockburger test will enable Tennessee courts to determine in a more straightforward manner whether multiple convictions under different statutes violate the state constitutional double jeopardy prohibition against multiple punishment.[43]

---

[41] Rudstein, 14 Wm. & Mary Bill Rts. J. at 232 (stating that the Fifth Amendment was ratified in 1791 and discussing its adoption).

[42] Except for the spelling of the word "offence," the text of article I, section 10 is identical to the text of the corresponding provision of the Pennsylvania Constitution.  Pa. Const. art. I, § 10 ("No person shall, for the same offense, be twice put in jeopardy of life or limb").  The Pennsylvania prohibition against double jeopardy was added to the Pennsylvania Constitution in 1790, six years before the same language appeared in a Tennessee Constitution and one year before ratification of the Fifth Amendment.  See Rudstein, 14 Wm. & Mary Bill Rts. J. at 223, 233; see also Commonwealth v. Wade, 33 A.3d 108, 118-20 (Pa. Super. Ct. 2011) (discussing article I, section 10 of the Pennsylvania Constitution).  For much of Pennsylvania's history, its state constitutional double jeopardy clause was interpreted as applying only "to multiple prosecutions for capital cases."  Wade, 33 A.3d at 119 (citing Commonwealth v. Henderson, 393 A.2d 1146 (Pa. 1978); Commonwealth v. Baker, 196 A.2d 382 (1964); McCreary v Commonwealth, 29 Pa. 323 (Pa. 1857)).  The Pennsylvania Supreme Court has stated that "there is no basis for suggesting that the framers of our Constitution intended to provide greater protection than that afforded under the Fifth Amendment."  Commonwealth v. Hogan, 393 A.2d 1133, 1138 (Pa. 1978).  Pennsylvania applies the Blockburger test to determine whether offenses are the same for double jeopardy.  See Caufman, 662 A.2d at 1052.

[43] As we have previously noted, "[s]ome aspect of double jeopardy may arise in many different types of cases, and the circumstances which give rise to the question are so varied and the fact situations so numerous that we do not deem it expedient to attempt to formulate a rule to fit all possible situations."  Black, 524 S.W.2d at 914.

*J. The Blockburger Test in Tennessee*

Under the Blockburger test, Tennessee courts must focus upon ascertaining legislative intent. If the General Assembly has expressed an intent to permit multiple punishment, no further analysis will be necessary, and multiple convictions should be upheld against a double jeopardy challenge. See, e.g., Godsey, 60 S.W.3d at 777; Blackburn, 694 S.W.2d at 936. Likewise, if the General Assembly has expressed an intent to preclude multiple punishment,[44] then no further analysis will be necessary, and improper multiple convictions should be vacated.[45]

Where the General Assembly's intent is not clearly expressed, the Blockburger test should be applied to determine whether multiple convictions under different statutes punish the "same offense." The first step of the Blockburger test is the threshold question of whether the convictions arise from the same act or transaction. This threshold question should be answered by reference to the charging instrument and the relevant statutory provisions. Here it is appropriate to consider whether the charges arise from discrete acts or involve multiple victims. Thus, what was formerly the third Denton factor now appropriately has a role to play in the threshold inquiry. If the convictions do not arise from the same act or transaction, there cannot be a violation of the double jeopardy protection against multiple punishment. Thus, a threshold determination that multiple convictions do not arise from the same act or transaction ends the inquiry and obviates the need for courts to further analyze double jeopardy claims. In this respect, the threshold inquiry serves the interest of judicial economy, while also providing lawyers and judges with a means of predictably evaluating the merits of multiple punishment double jeopardy claims.[46]

---

[44] See, e.g., Tenn. Code Ann. § 39-14-404(d) (2010) ("Acts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both."); Tenn. Code Ann. § 39-14-149(c) (2010) ("If conduct that violates this section [a]lso constitutes a violation of § 39-14-104 relative to theft of services, that conduct may be prosecuted under either, but not both, statutes as provided in § 39-11-109."); Tenn. Code Ann. § 39-12-204(e) (2010) ("A person may be convicted either of one (1) criminal violation of this section, including a conviction for conspiring to violate this section, or for one (1) or more of the predicate acts, but not both.").

[45] Where a Court concludes that the legislature does not intend to permit dual convictions under different statutes, the remedy is to set aside one of the convictions, even if concurrent sentences were imposed. Ball v. United States, 470 U.S. 856, 864 (1985) (citing Hunter, 459 U.S. at 368). "The second conviction, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored." Ball, 470 U.S. at 865.

[46] For example, under the test adopted today, the Court of Criminal Appeals in State v. Parham, No. W2009-02576-CCA-R3-CD, 2010 WL 5271612, at *6 (Tenn. Crim. App. Dec. 10, 2010), could have ended its analysis at the threshold determination. In Parham, considering the third Denton factor, the intermediate

(continued...)

If the threshold is surpassed, meaning the convictions arise from the same act or transaction, the second step of the Blockburger test requires courts to examine the statutory elements of the offenses. If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy.[47] However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

In nearly all cases involving multiple description claims, application of the Blockburger test will provide a definitive answer to the question of whether the Legislature intended to permit multiple convictions under separate statutes. In the rare case where doubt as to legislative intent remains after application of the Blockburger test, courts may consider other evidence of legislative intent, including the purposes and history of the relevant statutes. See Albernaz, 450 U.S. at 342-43; see also Hunter, 459 U.S. at 367 (observing that in Albernaz, "[w]e might well have stopped at that point [after applying the Blockburger test]," but "we went on" to determine that "'[n]othing . . . in the legislative history . . . disclose[d] an intent contrary to the [Blockburger] presumption'"); Beauregard, 32 S.W.3d at 683-84 (discussing the distinct purposes of rape and incest statutes); see also State v.

_____

[46](...continued)
appellate court concluded that the offenses "involved discrete acts on the part of the defendant," with his conviction of aggravated robbery based on "his intentional or knowing theft of the victim's cash and jewelry by violence that was accomplished by the use of a deadly weapon" and his theft conviction "based on his having knowingly obtained or exercised control over the victim's vehicle without her consent and with the intent to deprive her of the vehicle." Id. Similarly, in State v. Brunner, No. W2008-01444-CCA-R3-CD, 2009 WL 2151822, at *11 (Tenn. Crim. App. July 17, 2009), the Court of Criminal Appeals likely could have ended its analysis at the threshold based on its statement, made in considering the third Denton factor, that even though there was only one encounter between the defendant and the victim, there were "arguably discrete acts" supporting the defendant's convictions of second degree murder and domestic assault since the defendant admitted beating the victim with a cane and strangling her. Id.

[47] See Tenn. Code Ann. § 40-18-110(g)(1)-(2) (2011 Supp.) (stating second degree murder is a lesser included offense of first degree murder, and voluntary manslaughter is a lesser included offense of first and second degree murder); Tenn. Code Ann. § 40-18-110(g)(3) (stating aggravated sexual battery is a lesser included offense of aggravated rape); Tenn. Code Ann. § 40-18-110(g)(4) (stating sexual battery and sexual battery by an authority figure are lesser included offenses of rape and aggravated rape); Tenn. Code Ann. § 39-15-401(f) ("A violation of this section may be a lesser included offense of any kind of homicide, statutory assault, or sexual offense, if the victim is a child and the evidence supports a charge under this section. In any case in which conduct violating this section also constitutes assault, the conduct may be prosecuted under this section or under § 39-13-101 or §39-13-102, or both."); see generally Tenn. Code Ann. § 40-18-110(f)(1)-(4) (providing a test by which to determine whether an offense is lesser included); State v. Burns, 6 S.W.3d 453, 466 (Tenn. 1999) (announcing a test by which to determine whether an offense is lesser included).

Collins, 166 S.W.3d 721, 726 (Tenn. 2005) (discussing the factors courts traditionally rely upon to discern legislative intent).

### K. Application of the Blockburger Test

Applying the foregoing principles in this case, we first consider whether the defendant's dual convictions arose from the same act or transaction. Here, there was only one victim, and Defendant was charged with committing both offenses on August 30, 2004, without reference to any specific or discrete acts.[48] Thus, the threshold is surpassed, meaning the potential for a double jeopardy violation exists in this case. The General Assembly has not expressed its intent either to permit or to preclude dual convictions of reckless homicide and aggravated child abuse. See Godsey, 60 S.W.3d at 778 (explaining that the Legislature has designated child abuse and child neglect, but not aggravated child abuse, as lesser included offenses of homicide). Thus, we must next examine the statutes defining the crimes of which the defendant was convicted in order to discern legislative intent.

Reckless homicide is statutorily defined as the "[r]eckless killing of another." Tenn. Code Ann. § 39-13-215(a) (2003). Aggravated child abuse as charged in this case is statutorily defined as follows: "A person commits the offense of aggravated child abuse . . . who commits the offense of child abuse . . . as defined in § 39-15-401 . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child . . . ." Tenn. Code Ann. § 39-15-402(a)(1) (2003). Child abuse as defined in section 401 occurs when "[a]ny person . . . knowingly, other than by accidental means, treats a child . . . in such a manner as to inflict injury . . . ." Tenn. Code Ann. § 39-15-401(a) (2003). At the time of this offense, "serious bodily injury" was defined as including a "substantial risk of death," "[p]rotracted unconsciousness," "[e]xtreme physical pain," "[p]rotracted or obvious disfigurement," or "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34) (2003).

Obviously, the definitions of reckless homicide and aggravated child abuse differ markedly. Reckless homicide requires proof of a killing; aggravated child abuse does not. Aggravated child abuse requires proof that the victim was a "child," that is, a person less than eighteen years of age; reckless homicide has no age-based element. Having applied the Blockburger test, we conclude that the defendant's convictions of reckless homicide and aggravated child abuse are not the same offenses for purposes of double jeopardy. Each offense includes an element different from the other offense. Neither offense is a lesser included of the other. Accordingly, we conclude that the General Assembly intended to

---

[48] In his written statement, Defendant admitted striking the victim's head against "the side of the crib" "about a week" before the offenses in this case occurred. However, the charges relate to Defendant's actions on August 30, 2004.

permit multiple convictions in this context. Thus, we hold that Defendant's dual convictions do not offend either the Double Jeopardy Clause of the Fifth Amendment or article I, section 10 of the Tennessee Constitution.

## CONCLUSION

Accordingly, we reverse that portion of the Court of Criminal Appeals' judgment merging the reckless homicide conviction into the aggravated child abuse conviction and reinstate the reckless homicide conviction. We agree with the Court of Criminal Appeals that the trial court erred in sentencing Defendant, and we therefore remand this matter to the trial court for a new sentencing hearing on both of Defendant's convictions.[49]

It appearing that Defendant is indigent, the costs of this matter are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, CHIEF JUSTICE

---

[49] Although Defendant committed the instant crimes in August 2004, he was not sentenced until March 2008, and the trial court sentenced Defendant pursuant to a 2005 amendment to the Sentencing Act. See Tenn. Code Ann. § 40-35-210 (Supp. 2005). While a defendant committing offenses prior to June 7, 2005, may elect to be sentenced under the 2005 amendment, he must execute a waiver of his ex post facto protections in order to make such an election. See Act of May 18, 2005, ch. 353, sec 18, 2005 Tenn. Pub. Acts 788, 796. Defendant did not execute such a waiver prior to his sentencing. Accordingly, the trial court erred in sentencing Defendant under the 2005 amendment. Unless Defendant chooses to execute such a waiver on remand, see State v. Banks, No. M2007-00545-CCA-R3-CD, 2008 WL 1699440, at *7 (Tenn. Crim. App. Apr. 11, 2008), the trial court may, on resentencing, consider as enhancement factors: (1) Defendant's prior convictions, if any; (2) facts admitted by Defendant; and (3) facts reflected in the jury's verdict as to each crime. See Blakely v. Washington, 542 U.S. 296, 303-04 (2004); State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007). Whether Defendant serves his sentences concurrently or consecutively must be determined pursuant to Tennessee Code Annotated section 40-35-115 (2010).