# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 6, 2011 Session

## STATE OF TENNESSEE v. JEREMIAH DAWSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-06150     J. Robert Carter, Judge**

_____

**No. W2010-02621-CCA-R3-CD  - Filed May 2, 2012**

_____

A Shelby County Criminal Court Jury convicted the appellant, Jeremiah Dawson, of aggravated robbery, a Class B felony; carjacking, a Class B felony; and employing a firearm during the commission of a dangerous felony, a Class C felony.  After a sentencing hearing, the appellant received an effective sentence of fourteen years in confinement.  On appeal, the appellant contends that (1) his dual convictions for carjacking and employing a firearm during the commission of a dangerous felony violate double jeopardy and (2) the evidence is insufficient to support the convictions.  Based upon the oral arguments, the record, and the parties' briefs, we conclude that dual convictions for carjacking by use of force or intimidation and employing a firearm during the commission of a dangerous felony do not violate double jeopardy and that the evidence is sufficient to support the convictions. Nevertheless, we conclude that the appellant's convictions for carjacking and employing a firearm must be reversed because the trial court improperly instructed the jury.  Therefore, the case is remanded to the trial court for a new trial as to those offenses.  The appellant's conviction for aggravated robbery is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are
Affirmed in Part, Reversed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ALAN E. GLENN, and JEFFREY S. BIVINS, JJ., joined.

R. Todd Mosley (on appeal) and Ruchee Patel (at trial), Memphis, Tennessee, for the appellant, Jeremiah Dawson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marlinee Iverson and Michael McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

In September 2008, the Shelby County Grand Jury jointly indicted the appellant and John Shabazz for the aggravated robbery of Terrance Cash-Heard; the carjacking of Terren Benton; and employing a firearm during the commission of a dangerous felony. The appellant was tried separately from his co-defendant.

At trial, Terren Benton testified that about 11:45 p.m. on July 22, 2008, she and her then-boyfriend, Terrance Cash-Heard, drove to the Burger King on East Brooks Road in Memphis. Benton was driving her father's white Toyota Corolla, and Cash-Heard was sitting in the front passenger seat. Benton pulled up to the drive-thru, and she and Cash-Heard placed their orders. Then she drove to the pick-up window. She said that while they were waiting to pay for their food, she "saw movement coming up from the hip part of the car." A male stood between the Corolla and the pick-up window, put a gun in Benton's window, and pointed the gun at her. The male pulled back the slide on the gun and tried to shoot Benton in her lap. However, the gun did not fire. Benton said that she eased over the center console toward her boyfriend and that she heard another male on the passenger side of the car say, "[D]on't even do it." Benton thought she was going to be killed.

Benton testified that a second gunman was standing outside the passenger-side door. He allowed Cash-Heard to open the door, and Cash-Heard and Benton got out of the car. The second gunman demanded money, and Cash-Heard gave him twenty dollars. The second gunman also took Cash-Heard's cellular telephone, and both gunmen got into the Corolla. The first gunman put the car into gear and drove away. Benton and Cash-Heard ran to the door of the restaurant, and employees let them inside. Benton used her cellular telephone to call her father and the police.

Benton testified that she did not see the first gunman's face but that he was wearing a black, short-sleeve shirt and had long, slim arms. The State showed Benton a black shirt, and she said it looked like the shirt the first gunman was wearing. The State also showed her a gun, and she identified it as the gun the second male was holding. She said she recognized the gun because it was "really shiny." The day after the crimes, Benton met with Sergeant Joseph Poindexter and looked at two photograph arrays. She did not identify anyone from the arrays. Benton acknowledged that she testified at the defendants' preliminary hearing and said that she identified Shabazz as the second gunman. When the State asked how she was able to identify Shabazz, she said that she was "face-to-face" with him when she got out of the car and that "he reminded me of someone that I work with at my job." Benton identified the appellant at the hearing as the first gunman. When the State asked how she

was able to identify him, she explained,

> That person outside of my window was really fidgety, really a
> lot of motion going on, a lot of seemed like anxiety and just a lot
> of motion and fidgety nervousness. And when we got in the
> courtroom, there was one guy that was anxious, moving, fidgety,
> the same exact movements, same exact movements that he was
> doing outside of my window and I knew that that was that
> person.

Benton also identified the appellant at trial, stating, "Before we came in [today], as we were waiting for court to start up, he was walking around and he was fidgety. He sat, like, maybe where the judge is on the other side of the pole foot tapping, arms moving, same thing."

Terrence Cash-Heard testified that on the night of July 22, 2008, he and Terren Benton went to the Burger King on East Brooks Road to get something to eat. The lobby was closed, so Benton pulled into the drive-thru. They placed their orders, and Benton drove to the pick-up window. Benton noticed someone approaching the driver's side of the car. Benton and Cash-Heard had their windows rolled down, and a male put a gun in Benton's window. Benton leaned toward Cash-Heard. Cash-Heard looked to his right and saw a second male approaching the passenger-side window. Cash-Heard said that the first gunman appeared to be holding a black nine millimeter handgun and that he "pulled the slide back to chamber a round." However, the gun jammed. The slide snapped back into place, and the first gunman pointed the gun toward Benton's lower torso. The second man also had a gun and pointed it toward Cash-Heard's lower torso. Cash-Heard said that he was scared, that the first gunman told them not to move, and that the second gunman "pretty much said the same thing."

Cash-Heard testified that he told the gunmen they could take the car. He said he got out and pulled Benton out through the passenger side because the first gunman was "forcing his way in." The second gunman told Cash-Heard, "[G]ive me your money, give me whatever you got." Cash-Heard gave him twenty dollars and a cellular telephone. The State showed Cash-Heard a cellular telephone, and he identified it as his phone. Cash-Heard said that the second gunman got into the car and that the gunmen drove away. Restaurant employees let the victims into the restaurant, and Benton telephoned her father and the police. Cash-Heard said that he did not see the first gunman but that he and Benton saw the second gunman "face-to-face" when they got out of the car. The police later showed him an array of six to eight photographs. When the State asked if he identified anyone from the array, he said, "I told [Sergeant Poindexter] that this guy, this certain guy who I picked out, out of all the people looked familiar to me. He looked like the same guy who we saw that

night." Cash-Heard acknowledged that he testified at the defendants' pretrial hearing and that he identified the appellant at the hearing as one of the gunmen.

On cross-examination, Cash-Heard testified that he thought the appellant was the second gunman, who was standing at the passenger-side window. He said the appellant was wearing "a white tall tee or something like that."

Officer Michael Jackson of the Memphis Police Department (MPD) testified that he responded to the robbery and carjacking and began looking in nearby apartment complexes for the white Corolla. About 12:45 a.m., he found the car less than one mile from the Burger King and started watching it. About fifteen minutes later, a white Cadillac with four people inside pulled up to the driver's side of the Corolla. Three people got out of the Cadillac and got into the Corolla. The Corolla drove away, and the Cadillac followed it. Officer Jackson, who was in an unmarked patrol car, followed the two cars. Officer Jackson said that other patrol cars joined him, that officers gave the "take-down signal," and that they stopped the Cadillac and the Corolla. The appellant was sitting in the front passenger seat of the Corolla and was holding Cash-Heard's black Motorola cellular telephone in his right hand. He was wearing a black t-shirt and a black hat and was very uncooperative. The driver of the Corolla, who was later identified as Deon Crittendon, fled but was apprehended about twenty-five minutes later. Crittendon's family or the appellant's family revealed Crittendon's location to the police. John Shabazz was driving the white Cadillac. Officer Jackson thought Shabazz was wearing a white t-shirt.

Officer Derrick Wilks of the MPD testified that in the early morning hours of July 23, 2008, he was working with Officer Jackson. Officer Wilks stopped the Cadillac and arrested Shabazz while Officer Jackson stopped the Corolla. The Cadillac was towed to the city impound lot.

Officer Patrick Parson of the MPD testified that in the early morning hours of July 23, 2008, he was in the Lake Park area and learned that a carjacked vehicle had been located. He went to the scene and saw the appellant, who was wearing a black, cutoff t-shirt and a baseball cap. The appellant had a cellular telephone that Officer Parson collected and tagged as evidence.

Louis Nelson, the Director of Safety and Security for Burger King, testified that he viewed video surveillance of the crimes. He said, however, that he "couldn't make anything really of it because it's a dark area."

Sergeant Joseph Poindexter of the MPD testified that on July 23, 2008, he put together two arrays containing the appellant's and Shabazz's photographs. Sergeant Poindexter

showed the arrays to the victims, but the victims were unable to identify anyone. Police officers interviewed the defendants, and Shabazz revealed that two guns were in the Cadillac. On July 24, 2008, Sergeant Poindexter found two guns on the car battery, underneath the Cadillac's hood. The slide on one of the guns would not pull the round out of the chamber. The other gun was a silver Jennings firearm.

Terre Fratesi testified that on August 8, 2008, she was the Chief Prosecutor for juvenile court and participated in a transfer hearing from juvenile court to adult court for the appellant, Shabazz, and Crittendon. She described the hearing as similar to a preliminary hearing. Other juveniles also were present in the courtroom, and the victims and Officer Jackson testified. At the hearing, Benton identified the appellant as the first gunman and Shabazz as the second gunman. Cash-Heard also identified the appellant as one of the gunmen. Fratesi said that Cash-Heard was not as "100 percent positive" about his identification as Benton.

On cross-examination, Fratesi testified that she thought Cash-Heard identified the appellant as the gunman on the driver's side of the car. However, she said, "I can't be sure."

Twenty-year-old Sean Brunson testified that he currently was on probation for attempted aggravated burglary and had a prior conviction for misdemeanor theft. Sometime on the night of July 22, 2008, Deon Crittendon arrived at Brunson's house, and Brunson's cousin gave Crittendon a haircut. Brunson said that at some point, he and Crittendon "met up" with the appellant. Brunson did not know the appellant, but the appellant was talking with Crittendon. Brunson wanted to go to his girlfriend's house. The appellant said he had a car and offered Brunson a ride. Brunson got into the backseat of a white car; the car was not a Cadillac. Crittendon drove the car, and the appellant sat either in the front passenger seat or in the backseat with Brunson. Brunson said that he saw the police and that "[t]he next thing you know I'm on the ground going to jail." Brunson was not charged with a crime in this case.

Valerie Noel, the appellant's aunt, testified for the appellant that on July 22, 2008, the appellant was at her home all day. That night, he left in order to go to the store and buy her a drink. He was wearing her blue house shoes. The appellant did not have a car, and Noel did not know if he left with anyone. The appellant was gone about ten or fifteen minutes when Noel's niece telephoned and told her that the appellant was in a police car. Noel and her brother went to the scene of the appellant's arrest. The appellant was sitting in a police car, and the police were looking for Crittendon, who had fled. Noel and her brother later found Crittendon at Noel's niece's house. Crittendon was wearing plaid shorts and a black and white t-shirt, and Noel's family revealed Crittendon's location to the police.

On cross-examination, Noel testified that she did not know what time the appellant left her home but that "it was late." She did not remember what the appellant was wearing. She said Crittendon was wearing "a white T-shirt and a black T-shirt."

Sixteen-year-old Myiesha Barnes, Noel's daughter and the appellant's cousin, testified that on the night of July 22, 2008, she was at home with her younger sister, her grandmother, and the appellant. The appellant had been there all day. However, at some point, he left in a car with someone named John. Barnes's cousin telephoned and said the appellant had been arrested. Barnes, her mother, and her uncle went to the scene of the appellant's arrest, and Barnes saw the appellant sitting in a patrol car. Later, she saw Deon Crittendon at her cousin's house. Barnes's family led the police to Crittendon.

The jury convicted the appellant as charged. After a sentencing hearing, the trial court sentenced him to eight years for the aggravated robbery conviction, a Class B felony; eight years for the carjacking conviction, a Class B felony; and six years for the employing a firearm during the commission of a dangerous felony conviction, a Class C felony. The trial court ordered that the eight-year sentences be served concurrently to each other and that the six-year sentence be served consecutively for a total effective sentence of fourteen years in confinement.[1]

## I. Analysis

### A. Double Jeopardy

The appellant claims that his dual convictions for carjacking and employing a firearm during the commission of a dangerous felony violate double jeopardy because he used the firearm to intimidate the victims during the carjacking. Thus, the evidence submitted to prove the carjacking charge included the evidence necessary to prove the employing a firearm charge. In a related argument, the appellant contends that the State's decision to charge him with employing a firearm during the commission of a dangerous felony is in direct contravention to Tennessee Code Annotated section 39-17-1324(c), which prohibits charging a defendant with the offense if possessing or employing a firearm is an element of the underlying dangerous felony. The State argues that the appellant's convictions do not violate double jeopardy because although the appellant used a firearm during the carjacking, he was charged with carjacking committed by use of force or intimidation. As noted by the

_____

[1]Although the sentencing hearing transcript has not been included in the record on appeal, Tennessee Code Annotated section 39-17-1324(e)(1) required that the appellant serve the six-year sentence imposed for employing a firearm during the commission of a dangerous felony consecutively to the eight-year sentence imposed for carjacking.

State, the appellant did not include his arguments in his motion for new trial. However, errors that would result in dismissal of a conviction are subject to plain error review. Tenn. R. App. P. 36(b) (stating that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal"). We conclude that the appellant is not entitled to plain error relief.

The double jeopardy clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. See State v. Nigel Kavic Watkins, ___ S.W.3d ___, 2012 Tenn. LEXIS 154, at *24 (Nashville, Mar. 9, 2012). The present case involves the third category. In Tennessee, whether two offenses are the "same" for double jeopardy purposes depends upon a close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances." See State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975). This analysis is guided in part by the application of the following test announced in Blockburger v. United States:

> Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

Id. (quoting Blockburger, 284 U.S. 299, 304 (1932)). In order to determine if double jeopardy attaches, our supreme court devised the following four-part test, also known as the "Denton test":

> (1) a Blockburger analysis of the statutory offenses;
>
> (2) an analysis, guided by the principles of [Duchac v. State, 505 S.W.2d 237, 239 (Tenn. 1973)], of the evidence used to prove the offenses;
>
> (3) a consideration of whether there were multiple victims or discrete acts; and
>
> (4) a comparison of the purposes of the respective statutes.

State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996).

The appellant argues that pursuant to the <u>Denton</u> test, which was in effect when he filed his appellate brief, his dual convictions for carjacking and employing a firearm violate double jeopardy because the convictions rely on the same evidence, his use of a firearm. In other words, they violate step two of the <u>Denton</u> test. However, our supreme court recently abandoned the <u>Denton</u> test and adopted the <u>Blockburger</u> same elements test. <u>Watkins</u>, ___ S.W.3d at ___, 2012 Tenn. LEXIS 154, at *70. As our supreme court explained in <u>Watkins</u>, under the new test, a court must initially focus on whether our legislature expressed an intent to permit multiple punishment. <u>Id.</u> at ___, 2012 Tenn. LEXIS 154, at *70. If the legislature clearly intended to permit multiple punishment, then a defendant's multiple convictions do not violate double jeopardy, and no further analysis is necessary. <u>Id.</u> at ___, 2012 Tenn. LEXIS 154, at *70. Similarly, if the legislature clearly intended to preclude multiple punishment, then a defendant's multiple convictions violate double jeopardy, and no further analysis is necessary. <u>Id.</u> at ___, 2012 Tenn. LEXIS 154, at *71. When the legislature's intent is not clear, the court must proceed with the <u>Blockburger</u> test, which considers whether the convictions arise from the same transaction and the statutory elements of the offenses. <u>Id.</u> at ___, 2012 Tenn. LEXIS 154, at *72.

Pursuant to <u>Watkins</u>, we will now consider whether the legislature intended to permit multiple punishment for carjacking and employing a firearm during the commission of a dangerous felony. Carjacking is defined as "the intentional or knowing taking of a motor vehicle from the possession of another by use of: (1) A deadly weapon; or (2) [f]orce or intimidation." Tenn. Code Ann. § 39-13-404(a). The appellant's indictment alleged that he committed carjacking by use of force or intimidation.

Tennessee Code Annotated section 39-17-1324(b)(1) provides that it is "an offense to employ a firearm during the . . . [c]ommission of a dangerous felony[.]" Carjacking is specified as a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(d). Tennessee Code Annotated section 39-17-1324(c) provides,

> A person may not be charged with a violation of subsection . . . (b) if possessing or employing a firearm is an essential element of the underlying dangerous felony <u>as charged</u>. In cases where possession or employing a firearm are elements of the <u>charged offense</u>, the state may elect to prosecute under a lesser offense wherein possession or employing a firearm is not an element of the offense.

(Emphasis added.)

The legislature specifically listed carjacking as a dangerous felony for which a

defendant could be prosecuted for employing a firearm. Therefore, the legislature obviously intended for dual convictions and multiple punishment. Additionally, the legislature's use of "as charged" and "charged offense" in Tennessee Code Annotated section 39-17-1324(c) convinces us that the legislature was authorizing, even encouraging, the State strategically to indict a defendant for both felonies. Therefore, the legislature clearly intended to permit multiple punishment for carjacking by use of force or intimidation and employing a firearm during the commission of a dangerous felony. As a result, further analysis is not necessary; the dual convictions do not violate double jeopardy. Moreover, the State's charging carjacking by use of force or intimidation and employing a firearm was not in direct contravention to Tennessee Code Annotated section 39-17-1324(c).

### B. Sufficiency of the Evidence

Next, the appellant claims that the evidence is insufficient to support the convictions because the victims' identifications of him were inadequate. The State claims that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based

upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The only argument the appellant makes regarding the sufficiency of the evidence is that the victims' identifications of him were inadequate to support the convictions. We note that the trial court instructed the jury on the theory of criminal responsibility. The jury chose to accredit the testimony of the State's witnesses, including the victims' identification testimony, and resolved any conflicts in favor of the State. Moreover, significant circumstantial evidence exists to support the convictions. The appellant was riding in the stolen car shortly after the crimes; was wearing the black t-shirt described and identified by Benton; was holding Cash-Heard's stolen telephone; and was in the company of John Shabazz, who the victims saw "face-to-face" during the crimes. In addition, the two guns used to commit the crimes were in the Cadillac, which Shabazz was driving and the appellant was riding in shortly before his arrest. The evidence is sufficient to support the convictions.

Nevertheless, we conclude that the appellant's convictions for carjacking and employing a firearm during the commission of a dangerous felony must be reversed. Although the appellant was indicted for carjacking by force or intimidation, our review of the jury charge reveals that the trial court instructed the jury on carjacking by force or intimidation and carjacking with a deadly weapon. "[W]hen a statute contains different ways to commit the offense it proscribes, the instruction given to the jury should be limited to the precise offense alleged in the charging instrument to the exclusion of the remaining theories." State v. Wayne E. Mitchell, No. 01C01-9209-CR-00295, 1993 Tenn. Crim. App. LEXIS 156, at *8 (Nashville, Mar. 1, 1993). Given the evidence, the jury very easily could have convicted the appellant of carjacking by use of a deadly weapon, a theory under which he was not charged. Moreover, convicting the appellant of carjacking by use of a deadly weapon when the weapon was a firearm would have precluded a conviction of employing a firearm during the commission of a dangerous felony. See Anthony D. Byers v. State, No. W2011-00473-CCA-R3-PC, 2012 Tenn. Crim. App. LEXIS 172 at **23-24 (Jackson, Mar. 15, 2012) (holding that charging a defendant with employing a firearm during the commission of a dangerous felony and carjacking by use of a deadly weapon when the only deadly weapon used was a firearm is in direct contravention to Tennessee Code Annotated section 39-17-1324(c)). Therefore, the appellant's convictions for carjacking and employing a firearm during the commission of a dangerous felony must be reversed and the case remanded to the trial court for a new trial as to those offenses. The appellant's conviction for aggravated robbery is affirmed.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, the appellant's

-10-

convictions for carjacking and employing a firearm during the commission of a dangerous felony are reversed, and the case is remanded to the trial court for a new trial. The appellant's conviction for aggravated robbery is affirmed.


_____
NORMA McGEE OGLE, JUDGE