IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 17, 2013 Session

**STATE OF TENNESSEE v. TOMMY HIGDON**

**Appeal from the Criminal Court for Campbell County**
**No. 11665     Jon Kerry Blackwood, Senior Judge**

**No. E2012-02146-CCA-R3-CD - Filed March 18, 2014**

The Defendant, Tommy Higdon, was convicted by a Campbell County Criminal Court jury of three counts of reckless endangerment, Class A misdemeanors, assault, a Class A misdemeanor, and resisting arrest, a Class B misdemeanor. *See* T.C.A. § 39-13-101, 39-13-103, 39-16-602 (2010). He was sentenced to concurrent sentences of eleven months, twenty-nine days for the reckless endangerment and assault convictions and six months for the resisting arrest conviction, all to be served on probation. On appeal, the Defendant contends that (1) his Fifth Amendment rights were violated because the indictment was improperly amended and a defect existed in the grand jury proceedings, (2) he was denied his right to confront witnesses against him, (3) his right to a speedy trial was violated, (4) his three reckless endangerment convictions violate principles of double jeopardy, and (5) he received the ineffective assistance of counsel. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

James Higdon (on appeal), Pro Se, and Michael G. Hatmaker and Donald Brent Gray (at trial), Jacksboro, Tennessee, for the appellant, James Higdon.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Lori Phillips-Jones, District Attorney General; and Steve Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

This case relates to a 2003 fire that destroyed the Defendant's Eagle Market in Jacksboro, Tennessee. At the trial, Joel Grayson Clark testified that in 2003 he worked as a LaFollette City Firefighter. He responded with his partner, Fireman Eddie Hatmaker, to a call at Eagle Market on March 19, 2003. They met Firemen Danny Lawson and Shannon Marlow at the scene. Fireman Marlow remained at the door to prevent the water hose from "smashing" the door and to help maneuver the hose into the building, and the remaining three firemen entered the building and walked down a hallway.

As Firemen Clark, Hatmaker, and Lawson entered the building, the water hose began to jerk. Fireman Clark thought Fireman Lawson was pulling the hose, but Fireman Lawson removed his hands from the hose to show he was not pulling it. Fireman Clark turned around and saw the Defendant in the doorway. He said the Defendant was pulling the water hose. The firemen took the Defendant outside, and Fireman Clark told Jacksboro Police Officer Jason Heatherly that the Defendant needed to be removed from the scene. The fireman reentered the building and resumed extinguishing the fire, but the Defendant returned to the doorway about two minutes later. The Defendant said he needed to get to his office. Firemen Clark, Hatmaker, and Lawson attempted to remove the Defendant from the premises, but the Defendant grabbed Fireman Marlow and "threw him across the parking lot."

Fireman Clark told the police officers at the scene to remove the Defendant from the premises. The Defendant was "loud and offensive," cursed at the firemen, and accused the firemen of not doing their jobs properly. Fireman Clark attempted to explain to the Defendant that he could not be inside the building and reentered the building. Fireman Clark said that at some point, he saw the Defendant pull on the water hose and that afterward, he saw the Defendant pinned to the ground by police officers, although he did not know what occurred. Minutes after the firemen reentered the building, the roof collapsed, and they evacuated the building.

On cross-examination, Fireman Clark testified that he received the call about the fire around 9:00 a.m. The fire was burning "quite heavily" when he and the other firemen arrived, and it ultimately consumed the building. Fireman Clark believed he had been inside the building for three or four minutes when he saw the Defendant, who repeated that he needed to get to his office. The Defendant appeared distraught. Fireman Clark agreed he told Officer Heatherly that if he did not remove the Defendant from the scene, Fireman Clark would remove the Defendant.

City of LaFollette Fireman Eddie Hatmaker testified that when he arrived at the scene, he entered the building with the other firemen. He saw the Defendant, who said he needed to get to the computer in his office. The Defendant cursed Fireman Hatmaker, who attempted to keep the Defendant out of the building. Fireman Hatmaker said that the Defendant "slung" him to the ground and that he grabbed the Defendant's arm and attempted to prevent the Defendant from entering the building. He said that the Defendant jerked away and that he yelled for the police officers to help. On cross-examination, Fireman Hatmaker testified that before the Defendant threw Fireman Marlow on the ground, he saw Fireman Marlow and the Defendant talking, although he could not hear what was said. He denied seeing Fireman Marlow shove the Defendant.

City of Jacksboro Fireman Shannon Marlow testified that when he arrived at the scene, he went to the east side of the building to help with a "forcible entry" through the rear door. Fireman Travis Shelton used an ax to enter the building. Fireman Marlow remained at the door to keep it open for ventilation and for an escape route. The Defendant appeared, and Fireman Marlow warned the Defendant twice that he needed to stay away from the building. When Fireman Marlow warned the Defendant a second time, the Defendant grabbed his coat and threw him to the ground. Fireman Marlow landed on his airpack and was unable to get up for a few minutes. He was transported to the hospital for back pain and underwent four to five weeks of physical therapy.

A video recording from the scene was played for the jury, and Fireman Marlow explained the video. We note that the recording is not included in the record. Fireman Marlow said he was standing in the doorway when the Defendant appeared. He attempted to tell the Defendant to move away from the building. Fireman Marlow identified himself as the person being thrown to the ground. He identified Officer Jason Heatherly and Deputy Freddie Stagnolia.

Campbell County Sheriff's Deputy Freddie Stagnolia testified that on March 19, 2003, he was a Caryville Police Officer and that he responded to the scene to assist with traffic control. He walked to the side of the building and saw the Defendant and Officer Heatherly. The Defendant stated that he was going inside to get his computer. Deputy Stagnolia thought the Defendant was belligerent. The Defendant, whose wife was the mayor of Jacksboro at the time, cursed Officer Heatherly and told him that he would "get him fired."

Deputy Stagnolia saw the Defendant pick up the water hose being used to extinguish the fire. He and Officer Heatherly attempted to remove the Defendant forcibly from the scene, but the Defendant broke away, struck Deputy Stagnolia in the chest, pushed against his throat, and grabbed his shirt attempting to pull him to the ground. It took Deputy Stagnolia, Officer Heatherly, and the Caryville Police Chief Bill Widener to subdue the

Defendant. The Defendant continued to kick and scream when the officers subdued him, and he threatened to kill them.

Former Caryville Police Chief Bill Widener testified that he assisted in creating a roadblock when he arrived at the scene. After talking to Fireman Hatmaker, he told Officer Stagnolia to go to the rear of the building. Chief Widener walked to the rear of the building where he saw an altercation between the Defendant, the firemen, and the police officers. The Defendant grabbed Deputy Stagnolia's tie and jerked it downward and pushed the deputy to the ground. Chief Widener, Deputy Stagnolia, and Officer Heatherly attempted to arrest the Defendant, who kicked, cursed, and threatened to kill them. Chief Widener denied seeing the Defendant enter the burning building.

The Defendant testified that when he arrived at the scene, his store was engulfed in flames. He went to the back door where he found firemen. He saw Fire Chief Shane Green, who told him electricity was still running to the building, using an ax to disconnect the electrical meter. The Defendant knew the gas pumps were still operational because of the electricity. He asked if anyone was inside the building, but no one answered. He was concerned his daughters and other employees were inside. He went to the back door, yelled, "[I]s anybody in there," and saw the firemen. He said that there was a problem with the fire truck and that no water was running through the hose. He attempted to get to his office to turn off the electrical boxes, which would have turned off the electricity to the gas pumps. He previously installed a panic button on his computer inside his office and was attempting to push it to shut down the gas pumps.

Two firemen grabbed the Defendant as he attempted to enter the building. He was a Vietnam veteran and shook off the firemen because he did not like being "pinned down." He thought Fireman Marlow fell over "a pop case" but conceded it could have been the result of his shaking away from the firemen. He denied intending to throw the fireman to the ground. Officer Heatherly ordered the Defendant to leave the area, but he refused because it was his property. Officer Heatherly was excited but calmed down, and he and the Defendant talked. The Defendant said he was "jumped" from behind and taken to the ground by Deputy Stagnolia and Chief Widener. He grabbed Deputy Stagnolia's tie to prevent his getting hurt as he fell to the ground. The officers struck him with their knees and elbows. He denied interfering with the firemen and said he attempted to help them.

On cross-examination, the Defendant denied that the officers and firemen told him to leave the property. He did not tell the firemen and the police officers at the scene that he was attempting to turn off the gas pumps and testified, "I'm so confused I'm lucky to be standing[.]" He denied knowing that firemen were trained to address property owners who attempted to reenter burning buildings. He denied pulling on the water hose.

-4-

Jerry Walden testified that on March 19, 2003, he worked for Powell Clinch Utility District (PCUD). PCUD was not dispatched to the scene, but he went to the scene. He saw the Defendant and heard one of the firemen tell the Defendant that he could not reenter the building. He bent down to lock the meter, and when he looked up, he saw police officers escorting the Defendant, who was handcuffed, away from the building. He was at the scene to turn off the natural gas.

Billy Phillips was at the Eagle Market when the fire was discovered by a cashier. He, Tommy Parks, and Bill Robinson ran to the Defendant's office. When they opened the door, the fire was "rolling." Everyone inside the building left. He saw the Defendant attempt to enter the building through the back door and heard the Defendant yell, "[H]it the . . . panic button." A fireman removed him from the area, although the Defendant continued to yell for someone to hit the panic button. The panic button was near the back door. He heard a fireman or police officer say, "[L]et the d--- thing burn." He saw three officers tackle the Defendant, throw him into a mud hole, handcuff him, and take him to a police car. He denied the Defendant fought the police officers.

Jeannie Higdon, the Defendant's wife and former Jacksboro mayor, testified that when she arrived at the scene, the Defendant was in handcuffs, bleeding, hurt, and upset. She saw an officer pushing the Defendant as he stood beside the police cruiser. She said the Defendant only wanted to turn off the gas pumps to prevent an explosion. Mr. Phillips turned off the gas pumps. Ms. Higdon knew the firemen. She knew the gas pumps needed to be turned off but did not mention it to the firemen or police officers because of the commotion.

City of Jacksboro Fireman J.C. Miller testified that he went to the scene, although he was off duty at the time. He first saw the Defendant after he was handcuffed. He saw Firemen Clark, Hatmaker, and Lawson at the scene and said they were spraying water on the fire from inside and outside the building. He did not witness any conversations between the Defendant, the police officers, and the firemen. The building collapsed when he arrived.

Upon this proof the Defendant was convicted of three counts of reckless endangerment, assault, and resisting arrest. The trial court sentenced him to eleven months, twenty-nine days respectively for the reckless endangerment and assault convictions and to six months for the resisting arrest conviction, all to be served concurrently on probation. This appeal followed.

**I**

The Defendant contends that his Fifth Amendment rights were violated because the indictment was improperly amended, he was improperly prohibited from playing the video recording of the scene in slow motion to the grand jury, the prosecutor presented fraudulent evidence to the grand jury, and the grand jury foreman had served beyond the two-year limitation. The State responds that the indictment was properly amended and that the Defendant's allegations regarding the grand jury are not supported by the record. We conclude the Defendant is not entitled to relief.

Regarding the Defendant's contention that the indictment was improperly amended, Tennessee Criminal Procedure Rule 7(b) states that a trial court may permit an amendment to the indictment "without the defendant's consent and before jeopardy attaches . . . if no additional or different offense is charged and no substantial right of the defendant is prejudiced." The record reflects that the indictment was amended to change the date of the offenses from April 19, 2003, to March 19, 2003. The amendment occurred before the trial began, involved no additional or different offense, and did not prejudice a substantial right of the Defendant. Although the Defendant objected to the amendment, the trial court did not err by permitting the State to amend the indictment.

Regarding the Defendant's grand jury allegations, the record reflects that issues related to the grand jury were not raised before the trial. Although not raised in the original motion for a new trial, the Defendant's pro se amended motion for a new trial alleged "Fifth Amendment - Grand Jury, witness affidavit." The trial court's order denying the motion for a judgment of acquittal and the motion for a new trial stated that the court found that the motions were not well taken. The order does not address individually the issues raised by the Defendant. We are unable to determine what, if anything, transpired at the hearing regarding the grand jury issues. The record does not support the Defendant's contention, and we conclude that the Defendant is not entitled to relief.

**II**

The Defendant contends that he was deprived of the right to confront three witnesses against him because they did not testify at the trial. He states that although Jacksboro Police Officer Jason Heatherly testified before the grand jury and was identified as a trial witness, he did not testify at the trial. Likewise, he states that although Police Chief Danny Chapman and Fire Chief Shane Green were identified as trial witnesses and were at the scene, they did not testify at the trial. He argues that the State's failure to present their testimony deprived him of the right to confront witnesses against him.

The State's failure to call the witnesses at the trial did not violate his right to confront witnesses. The Confrontation Clause is triggered when the State offers out-of-court statements made by a witness without presenting the declarant at the trial. The State did not offer out-of-court statements made by the three witnesses. When witnesses attempted to provide hearsay testimony at the trial, counsel objected, and the trial court sustained those objections.

We note that the Defendant did not object at the trial regarding the State's failure to call the witnesses at issue. *See* Tenn. R. Evid. 103; T.R.A.P. 36(a). Likewise, nothing prevented the Defendant from calling these witnesses at the trial to testify in his case-in-chief. This court has concluded that no precedent exists stating "that the Confrontation Clause requires the State to call as witnesses at trial any and all individuals who may have actually witnessed related events." *State v. John Adrian Day*, No. E2010-01108-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App. July 18, 2012). The Defendant is not entitled to relief.

**III**

The Defendant contends that his right to a speedy trial was violated, although he fails to argue how the delay affected his case. The State responds that the Defendant failed to assert his right to a speedy trial and that he is not entitled to relief. We agree with the State.

Upon the State's initiation of criminal proceedings, the right to a speedy trial is implicated under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. This right is statutory, as well, in Tennessee. T.C.A. § 40-14-101 (2006). In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court devised a balancing test to determine whether a defendant's right to speedy trial was violated and identified four factors for consideration: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to speedy trial; and (4) the prejudice to the defendant. *Id.* at 530. In *State v. Bishop*, 493 S.W.2d 81 (Tenn. 1973), the Tennessee Supreme Court implicitly adopted the *Barker* balancing test for our state's constitutional and statutory right to a speedy trial.

The record shows that the offense occurred on March 19, 2003, and that the indictment was returned in June 2003. On November 9, 2006, the State moved to amend the indictment to correct the offense date, which erroneously stated April 19, 2003. The Defendant filed a response on November 13, 2006, and the State filed an answer on December 11, 2006. The State's motion was granted on February 7, 2007. On December 29, 2008, the Defendant filed a motion requesting that the district attorney's office and staff be prohibited from participating in the case, and the trial court granted the motion on February 8, 2010. Although the original order is not in the record, an August 15, 2011

amended order from the Tennessee Supreme Court designated a new trial judge to preside over the Defendant's trial, and the trial was held on August 22, 2011.

The motion for a new trial was filed by counsel on September 20, 2011. After the trial and the motion for a new trial was filed, the Defendant filed several pro se motions, including a motion for an in camera review of the grand jury, a motion in limine, a motion to exclude testimony, a motion to exclude the video recording presented at the trial, and a motion for a bill of particulars. On October 2, 2012, the trial court entered an order denying the motions on the ground that the motions addressed matters inapplicable to a motion for a new trial. The hearing on the motion for a new trial was held on November 19, 2012.

The first prong of the *Barker* inquiry is the length of the delay. In the present case, the Defendant was indicted in June 2003, and the trial was held on August 22, 2011. A delay which approaches one year is sufficient to trigger further inquiry. *Doggett v. United States*, 505 U.S. 647, 652 (1992); *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997). The length of the delay in the Defendant's case is sufficient to evaluate the remaining *Barker* factors. We note that this delay does not, alone, weigh heavily against the State. *See State v. Wood*, 92 S.W.2d 341 (Tenn. 1996) (concluding thirteen-year delay not excessive).

No explanation exists in the record for the inaction in the case until the State moved to amend the indictment on November 9, 2006, or for the inaction until a new trial judge was designated on August 15, 2011. The Defendant knew of the pending charges but did not invoke his right to a speedy trial, although he belatedly asserted the right in an amended motion for a new trial. As a result, we conclude the Defendant acquiesced in the delay and failed to assert his right. *See Wood*, 924 S.W.2d at 347.

The Defendant fails to assert how he was prejudiced by the delay. The record shows the Defendant was on bond pending the trial. Likewise, the Defendant has failed to show that he suffered anxiety and concern or that the delay impaired his defense. Under these circumstances, we conclude that the Defendant has failed to establish a speedy trial violation. He is not entitled to relief on this basis.

**IV**

The Defendant contends that his three reckless endangerment convictions violate double jeopardy principles. He argues the convictions are multiple punishments for the same offense. The State responds that the convictions do not violate double jeopardy principles because each offense involved a different victim. We agree with the State.

The double jeopardy clauses of the United States and Tennessee Constitutions state that no person shall be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The clause has been interpreted to include the following protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989); *State v. Phillips*, 924 S.W.2d 662, 664 (Tenn. 1996).

At the time of the offenses, double jeopardy issues involving multiplicity of offenses were evaluated based upon the facts and circumstances of the case. *See, e.g.*, *State v. Pickett*, 211 S.W.3d 696, 705-06 (Tenn. 2007); *Phillips*, 924 S.W.2d at 665. Our supreme court, though, has since applied the analytical framework of *Blockburger v. United States*, 284 U.S. 299, 304 (1932), to determine if double jeopardy protections permitted convictions of multiple offenses. *State v. Watkins*, 362 S.W.3d 530, 543 (Tenn. 2012); *see State v. Cross*, 362 S.W.3d 512 (Tenn. 2012) (applying the *Blockburger* framework to pre-*Watkins* offenses). "In single prosecutions, multiple punishment claims ordinarily fall into one of two categories, . . . referred to as 'unit-of-prosecution' and 'multiple description' claims." *Watkins*, 362 S.W.3d at 543. Unit-of-prosecution claims arise "when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the 'same offense.'" *Id.* Regarding unit-of-prosecution claims, *Watkins* said that the pertinent analysis involves determining "'what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment.'" *Id.* (quoting George C. Thomas, *A Unified Theory of Multiple Punishment*, 47 U. Pitt. L. Rev. 1, 11 (1985)). Courts are to "apply the 'rule of lenity' when resolving unit-of-prosecution claims, meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution." *Id.* (citing *Gore v. United States*, 357 U.S. 386, 391-92 (1958)).

A person commits reckless endangerment when he or she "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a) (2010). The Defendant was indicted for four counts of reckless endangerment, and each count identified a unique victim. Count 5 alleged that the Defendant's reckless conduct placed Joel Clark in imminent danger of death or serious bodily injury. Count 6 named Eddie Hatmaker as the victim. Count 7, which was ultimately dismissed, named Doyle Williamson as the victim. Count 8 named Daniel Lawson as the victim.

In *State v. Payne*, 7 S.W.3d 25, 29 (Tenn. 1999), the State indicted the defendant for reckless endangerment against "the public at large." The court noted that the State had the option of pursing multiple counts of reckless endangerment against individual victims. *Id.* at 29 n.5. The Defendant's double jeopardy claim does not survive the threshold inquiry because his three convictions for reckless endangerment involve three distinct victims. He is not entitled to relief.

**V**

The Defendant contends that he was denied the effective assistance of counsel. He states that counsel and the trial judge "promised to let [him] speak and tell his story in the closing statement," that he was not permitted to speak, and that counsel made improper statements during his closing argument. He also argues counsel were ineffective because they failed to subpoena witnesses, failed to present evidence at the trial, failed to provide him discovery, failed to meet with him adequately, failed to cross-examine the State's witnesses adequately, failed to show the video recording in slow motion to highlight his use of self-defense when Fireman Marlow grabbed and pulled him, and prevented him from participating in formulating jury instructions. The State responds that the issue is waived. We agree with the State.

Although not raised in the original motion for a new trial, the Defendant's amended pro se motion for a new trial raised the issue of ineffective assistance of counsel. The trial court's order denying the motion for a judgment of acquittal and the motion for a new trial states that the court found that the motions were not well taken. The order does not address the issues individually. Likewise, the transcript of the hearing on the motions is not included in the appellate record. We are unable to determine what transpired at the hearing. Further, we are prevented from knowing what, if any, evidence of the ineffective assistance of counsel issue was presented and the findings and conclusions of the trial court. The record does not support the Defendant's contention, and we conclude that the Defendant is not entitled to relief.

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE